FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 15 2021

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**UNITED STATES OF AMERICA**                                   **PLAINTIFF**

**v.**                              **CASE NO. 4:20CV-307-KGB**

**$332,057.00 IN U.S. CURRENCY**                              **DEFENDANT**

**SUNG KIM**                                                   **CLAIMANT**


### MOTION TO SUPPRESS EVIDENCE AND BRIEF IN SUPPORT

COMES NOW the Claimant, Sung Kim, by and through his attorney, Toney Brasuell of the Brasuell Law Firm, pursuant to Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Rule 7.2 of the Eastern District of Arkansas Local Rules, and all other applicable federal statutes and legal precedent, and for his Motion states as follows:

The Arkansas State Police conducted a traffic stop of the Claimant, Sung Kim. The stop and search violated Kim's constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment. There was no probable cause for the traffic stop of Kim's car, insufficient cause for the seizure and questioning of Kim or his passenger, insufficient cause for the continued detention of Kim, his passenger and the car, and the resulting search was a direct product of this illegal detention. Further, the search was made without freely given voluntary consent and in the absence of probable cause to justify it under the Fourth Amendment. All evidence subsequently seized was thus fruit of the poisonous tree. Mr. Kim moves to

suppress all evidence alleged recovered as a result of the unlawful seizure and search of Mr. Kim and his vehicle.

## I.      Factual Background.

On September 10, 2019, at approximately 7:00 a.m., Arkansas State Police Trooper Andrew May conducted a traffic stop on a silver 2018 Nissan Rogue. The driver of the Rogue was Sung Kim, and the only passenger in the vehicle was Kim's spouse, Hyun Jung Kim. The traffic stop was captured and recorded by Trooper May's patrol car camera, hereinafter referred to as "dashcam". *See Exhibit A.* Trooper May made contact with the occupants of the vehicle through the passenger side window.  Dashcam footage showed that Trooper May stated to the driver, Sung Kim, "When you went past me you crossed the fog line." In the incident report, Trooper May stated, "[a]s I was travelling westbound on Interstate 40 I observed the Silver Nissan Rogue drive onto the inside fog line numerous times violating Arkansas statute 27-51-302." *See Exhibit B.*

As we will discuss below, the following times will be important for the court's factual analysis:

  a.  Time the traffic stop was initiated: Approximately 7:00 a.m.

  b.  Time from initial contact with Sung Kim until Trooper May concludes that criminal activity is ongoing: Thirty (30) seconds.

  c.  Time from initial contact until Trooper May requires Sung Kim to exit Nissan Rogue and respond to interrogation from patrol car: Thirty-five (35) seconds.

  d.  Time from stop until Trooper May runs background information for Sung Kim: Approximately three (3) minutes.

  e.  Time from stop until Trooper May informs Sung Kim he does not intend to issue a ticket: Approximately three (3) minutes and forty (40) seconds.

f. Time from stop until Trooper May runs background information on Hyun Kim: Approximately five (5) minutes and thirty (30) seconds.

g. Time from stop until Sung Kim declines consent to search the vehicle: Approximately seven (7) minutes.

h. Time from stop until Trooper May issues warning ticket: Twenty-five (25) minutes, which was more than twenty-one (21) minutes after informing Sung Kim he did not intend to issue a ticket. *See Exhibit C.*

i. Time from stop until drug dog arrives: Approximately thirty (30) minutes.

Sung Kim provided Trooper May with his driver's license and rental agreement, which showed the vehicle had been rented on September 9, 2019, to be driven to Las Vegas. From that point forward, Trooper May never again mentioned the alleged fog line issue nor did he write a ticket. In fact, the dashcam reveals that approximately three minutes and forty seconds into the stop, Trooper May informed Kim that he did not intend to write him a ticket. According to the dashcam, approximately 35 seconds after making contact with Sung Kim, Trooper May had Sung Kim exit the vehicle and accompany him back to his patrol car, where Trooper May questioned Sung Kim about matters completely unrelated to the traffic stop while he ran the information on the vehicle and performed a background check on Sung Kim. The dashcam also reveals that Trooper May informed Trooper Blackerby that after 30 seconds of speaking with Sung Kim, the traffic stop transformed into a criminal investigation. At that point, Sung Kim and Hyun Kim were both in custody and seized, and all further interrogation was subject to Fifth and Sixth Amendment protections.

According to the dashcam, Sung Kim advised he and his wife had rented the Rogue to drive to Las Vegas. Kim explained that the trip was a honeymoon surprise

for his wife and while he would like to stay for a week, they would probably only stay a couple of days. Sung Kim acknowledged he and Hyun Kim had been married more than 20 years, however, he explained to Trooper May that they had never been on a vacation.  Sung Kim also explained that the couple intended to stay at the Aria Hotel.

According to the Government's Complaint, Trooper May claimed Sung Kim made his responses nervously; however, dashcam footage of the interaction between Sung Kim and Trooper May contradicts the Government's allegation. The audio from the traffic stop depicted Sung Kim engaging with Trooper May casually and laughing.  According to the dashcam, when Trooper May inquired about the one-way rental, Sung Kim stated he and his wife planned to fly home from Las Vegas. Kim explained that he and his wife wanted to sightsee, and he had brought his camera along to photograph sights along the drive.  Trooper May ran a background check on Sung Kim that revealed a 2014 charge for possession of marijuana but no conviction.

Trooper May then returned to the Nissan Rogue and asked Hyun Kim many of the same questions concerning her and her husband's travel plans.  Hyun Kim can be heard informing Trooper May that she and her husband were going to be in Las Vegas for a week and that they might fly home or might drive the rental vehicle home.

According to the dashcam, approximately two minutes and fifteen seconds after informing Sung Kim that he did not intend to write him a ticket[1], and approximately six minutes into the stop, Trooper May asked Sung Kim for consent to search the Rogue. Sung Kim declined consent to search his vehicle. Trooper May immediately advised Sung Kim that he was going to call for a drug dog to conduct a sniff of the vehicle. According to the dashcam footage, approximately thirty minutes passed between the initial seizure of the vehicle and the arrival of the drug dog.

Approximately twenty-seven minutes passed between Trooper May informing Mr. Kim he did not intend to write a ticket and the arrival of the drug dog, and approximately twenty-five minutes passed between Mr. Kim's refusal of consent to search his vehicle and the arrival of the drug dog.

Prior to Sung Kim denying consent to conduct a search of the vehicle, Trooper May ran a background check on Hyun Kim, which revealed no criminal history, and then continued interrogating Sung Kim. Sung Kim continued to respond to Trooper May's interrogation. Trooper May questioned Sung Kim about his prior arrest for marijuana possession. Sung Kim acknowledged the arrest but contended the offense involved a small quantity of marijuana and that the marijuana belonged to someone else who had been in the vehicle.

During the continued seizure, Trooper May told Hyun Kim "I'm pretty suspicious of your husband's nervousness and just kind of what's going on, I asked

---

[1] While the warning ticket states that it was issues at 7:25 a.m., based upon Trooper May's statements, it should have been issued at approximately 7:04 a.m., further supporting Claimant's theory that the stop was pretextual in nature and impermissibly extended beyond the time reasonably necessary to perform the necessary tasks related to an investigatory stop.

for his consent to search the car and he told me I can't search the car, so my partner is bringing a dog over here and we're gonna run the dog around the car." Trooper May then apologized to Hyun Kim for the delay and requested that she be patient with him.

At 32 minutes and 51 seconds into the dashcam footage, Trooper Mark Blackerby arrived with his canine partner, Raptor, and walked Raptor around the Rogue. Paragraph 42 of the Government's Complaint alleged that Raptor alerted to an odor of narcotics on the Rogue. According to the Government's Complaint, a subsequent search of the Rogue revealed the Defendant Currency in two duffel bags and a backpack in the rear of the Rogue, vacuum sealed, and three cellular devices, all of which was confiscated by the Arkansas State Police.

However, the search of the Rogue did not reveal any drugs or drug paraphernalia. The Nissan Rogue was towed and Sung Kim and Hyun Kim were taken to the police station.

At some point, State Police sought investigative assistance from the Drug Enforcement Administration ("DEA"). DEA Task Force Officer ("TFO") Stephen Briggs responded and interrogated Sung and Hyun Kim. At some point, Sung Kim invoked his right to counsel. The Defendant Currency was taken to a bank and counted. The bank's count showed that the money was $332,057.00 in U.S. currency. The bank recorded the denominations of the money, and those records showed that the Defendant Currency included 47 $1.00 bills, 954 $5.00 bills, 1,369 $10.00 bills, 13,730 $20.00 bills, 169 $50.00 bills, and 305 $100.00 bills. In the days

following the seizure, the DEA adopted the case and conducted an administrative forfeiture proceeding regarding the Defendant Currency.

At the time Trooper May required Sung Kim to exit the vehicle and sit in the patrol car, he only knew that Sung Kim and Hyun Kim were traveling in a rental vehicle, and that they had provided the requested documentation. At the time Trooper May informed Sung Kim he did not intend to issue a traffic ticket, he had learned that Sung Kim and Hyun Kim were traveling to Las Vegas in a rental vehicle as a late honeymoon, having never taken a vacation, that they intended to sightsee on the way to Las Vegas before flying back home, and that Sung Kim had been charged with, but not convicted of, marijuana possession in 2014. At the time Trooper May requested, and was denied, consent to search the Nissan Rogue, he still only knew the above stated information. Between the time that Trooper May informed Sung Kim that he intended to let him go without issuing a ticket and the time at which Sung Kim declined consent to search his vehicle, there were no intervening circumstances that would give rise to reasonable suspicion.

Trooper May told Sung Kim and Hyun Kim that he witnessed their Nissan Rogue cross the fog line; however, it is clear from the dashcam footage that the Nissan Rogue did not cross the fog line. Trooper May did not have probable cause to conduct a traffic stop. Further, after conducting an illegal traffic stop, Trooper May did not have reasonable suspicion to continue the detention of Sung Kim and Hyun Kim and seizure of the Nissan Rogue. Trooper May did not see any furtive movements or weapons, did not smell alcohol or marijuana, saw no drugs, and saw

nothing else that would lead him to suspect that any criminal activity might be ongoing.

## II.    Applicable State Statutes and Rules.

### a.    Ark. Code. Ann. § 27-51-302. Roadways Divided Into Lanes. *See Exhibit D.*

Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent with this subchapter shall apply:

(1) A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety; and

(2) Official signs may be erected directing slower-moving traffic to use a designated lane or allocating specified lanes to traffic moving in the same direction, and drivers of vehicles shall obey the directions of every such sign.

### b.    Ark. R. Crim. P. 3.1. Stopping and Detention of Person: Time Limit. *See Exhibit E.*

A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of

not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

### III. Legal Arguments.

a. Trooper May did not have probable cause to conduct a traffic stop of the Nissan Rogue.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure under the Fourth Amendment. *See United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). A traffic stop is reasonable where the police have probable cause to believe that a traffic violation occurred, *Wren v. United States*, 517 U.S. 806, 810 (1996), and any traffic violation provides probable cause for a traffic stop. *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994). Here, Sung Kim did not commit a traffic violation/cross the fog line, as is clear from the dashcam; therefore, the resulting traffic stop was violative of Kim's Fourth Amendment rights.

However, should the district court find that Sung Kim touched the fog line, Trooper May still did not have probable cause to conduct a traffic stop, because that alleged act does not violate A.C.A. § 27-51-302.

In Trooper May's incident report, Trooper May alleges Sung Kim drove onto the fog line numerous times in violation of A.C.A. § 27-51-302. While not conceding that Kim drove onto the fog line, the relevant statute states in pertinent part that a

vehicle shall be driven "as nearly as practical" within a single lane; thus, driving onto or touching the fog line would not be in violation with the statute.

Courts in the Sixth, Ninth, and Tenth Circuits interpreting similar, if not identical, statutory language to that in A.C.A. § 27-51-302 have held that "touching the line is not enough to constitute [a motor vehicle violation]." *U.S. v.* Colin, 314 F.3d 439, 444 (9th Cir. 2002).

In *U.S. v. Colin*, Sergeant Carmicheal observed a vehicle on I-15 drift onto the white fog line and remain there for ten (10) seconds. The car then drifted to the left side of the lane, made a lane change with the proper signal, and drifted to the left double yellow line and remained there for ten seconds. Sergeant Carmicheal conducted a traffic stop. The Court stated that the defendant's car "touched" the fog line and the double yellow line but never crossed the fog line or the double yellow line; therefore did not violate California traffic code. It should be noted that California Code Section 21658(a) is similar to A.C.A. § 27-51-302(1).

The Court also noted that there have been similar rulings that touching the center line is not enough to consider it "lane straddling". *See, e.g., United States v. Gregory,* 79 F.3d 973, 978 (10th Cir.1996) (holding that an isolated incident of a vehicle crossing into the emergency lane of a roadway does not violate state statute's requirement that vehicles remain entirely in a single lane "as nearly as practical"); *United States v. Guevara-Martinez,* 2000 WL 33593291, at *2 (D.Neb. May 26, 2000) (interpreting a similar Nebraska statute and concluding that touching, but not crossing, the broken line between two southbound lanes twice in a half mile

did not violate the statute's "near as practicable" requirement), *aff'd,* 262 F.3d 751 (8th Cir.2001).

Many courts have similarly found no traffic violation, and therefore no probable cause, under similar circumstances. *See, e.g., U.S. v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) (finding no violation of Tenn. Code Ann. § 55-8-123, which requires that "[a] vehicle shall be driven as nearly as practicable within a single lane," but does not require vehicles to strictly maintain the lane at all times, where officer observed vehicle straddle two lanes for "a few seconds while changing from one lane to the other"); *U.S. v. Warfield*, 727 Fed. Appx. 182, 186 (6th Cir. 2018)(unpublished) (concluding officer lacked probable cause for traffic stop where driver's tires touched lane lines); *U.S. v. Delgado-Hernandez*, 283 Fed. Appx. 493, 499 (9th Cir. 2008)(unpublished) (holding driver crossing over fog line for a brief instance "neither posed a safety threat nor failed to drive as nearly as practicable within a single lane.").

Here, Trooper May alleges in his incident report that he observed the Nissan Rogue drive onto the inside fog line numerous times; however, the dashcam does not show any such traffic violation which would give rise to probable cause for Trooper May to conduct the traffic stop. However, should the district court find that the Rogue did drive onto the fog line, it should agree with the above circuits' legal interpretation that the touching or brief crossing of the fog lane is within the statutory "as nearly as practical entirely within a single lane" requirement.

        b.      Trooper May did not have reasonable suspicion to prolong the detention after completion of the traffic stop.

Even assuming, *arguendo*, that the initial seizure was lawful, Trooper May did not have reasonable suspicion to prolong the seizure after the purpose of the stop had been accomplished. Here, according to Trooper May, the purpose for the stop was to investigate the crossing of the fog line. Authority for the seizure ends when the tasks tied to the traffic infraction are – or reasonably should have been – completed. *Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015). Exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. *Rodriguez v. U.S.* at 350. Although an officer may conduct certain unrelated checks during a traffic stop, he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. *Id* at 354. The Fourth Amendment does not tolerate a dog sniff conducted after completion of a traffic stop. *Id* at 350. Police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search. *U.S. v. Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003).

The Eighth Circuit has acknowledged that certain actions incident to a lawful traffic stop are permitted, such as requesting the driver's license and registration, requesting that the driver step out of the vehicle, requesting that the driver wait in the patrol car, conducting computer inquiries to determine the validity of the license and registration as well as the driver's criminal history, and making inquiries into the motorist's destination and purpose. *U.S. v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001).

However, in *United States v. Jones*, the Eighth Circuit found that once this initial investigation has been completed, the legitimate purposes of the traffic stop are completed, and it is an unreasonable extension of the scope of the investigation to further detain the driver or his vehicle, absent the occurrence of something during the stop that generated the necessary reasonable suspicion to justify a further detention. *Id.* at 925. This suspicion must be based upon "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime [is] being committed." *Id.* at 927.

Although it is typically reasonable to detain a driver while awaiting the results of a criminal history check, the Eleventh Circuit emphasized in *Boyce* that the history check must be part of the original traffic stop investigation, and found that where a license check and warning ticket has already been issued, continued detention to perform further checks is an unlawful prolonging of the traffic stop. *Boyce* at 1107.

In *Jones*, the Eighth Circuit found that the government's argument for reasonable suspicion was based largely on seemingly innocent circumstances. *Id.* Jones' slowing down while being passed, his camper wheels crossing traffic lines, his inconsistent answers regarding his prior arrest record, and his nervousness upon being detained and questioned inside the trooper's patrol car were not accepted to be factors, even viewed in combination, which could support the determination of reasonable suspicion. *Id.* at 929. The Court in *Jones* further emphasized that it is not abnormal or unusual for a motorist to exhibit signs of

nervousness when confronted by a law enforcement officer. *Id.* In another Eighth Circuit case, the Court found that the totality of the circumstances did not give rise to reasonable suspicion to prolong a traffic stop where there were air fresheners placed in several vents, the driver seemed extremely nervous and provided inconsistent/limited details about his trip, and the driver's name was "flagged" by immigration services. *U.S. v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004).

Sister circuits have similarly held that in the absence of reasonable suspicion of criminal activity, an individual may not be detained after completion of a lawful traffic stop. *Boyce* at 1110. In *Boyce*, the Eleventh Circuit found driving a rental car on a known drug corridor and planning to return the car two days late did not give rise to reasonable suspicion. Although the officer in *Boyce* asserted the detainee's nervousness and unusual travel plans as factors contributing to reasonable suspicion, the Eleventh Circuit declined to consider these factors as contributory. Review of the incident's dashcam footage did not indicate nervousness on behalf of the detainee, and the Court determined the officer's subjective opinion about the detainee's travel destination and purpose did not give rise to reasonable suspicion. *Id.* Further, the court found that the only significant event between the time the officer wrote a traffic ticket and the time the officer called for the drug dog was the driver asserting his constitutional right not to let the officer search his car. *Id.* The Court stated that this circumstance suggested the true reason the officer in *Boyce* chose to extend the detention of the driver was because the driver would not

consent, noting that the immediacy of the officer's response in calling the drug dog after the driver's refusal further supported such a conclusion. *Id.*

The Arkansas Rule of Criminal Procedure 3.1 provides even more protection for individuals, requiring that a law enforcement officer detain a person he reasonably suspects is committing a felony for no longer than fifteen minutes or "for such time as is reasonable under the circumstances." Ark. R. Crim. P. 3.1. The Arkansas Supreme Court requires that reasonable suspicion for continued detention be, under the totality of the circumstances, supported by specific, particularized, and articulable reasons indicating that the person may be involved in criminal activity. *Hoey v. State*, 519 S.W.3d 745, 755 (Ark. App. 2017). An officer making a traffic stop must develop reasonable suspicion to detain before the legitimate purpose of the traffic stop has ended. *Sims v. State*, 157 S.W.3d 530 (Ark. 2004). The Arkansas Supreme Court has found that a person's mere nervousness and sweating does not give rise to an objective and particularized basis for reasonable suspicion. *Id.* at 535-36.

The Arkansas Appellate Court has held there was no reasonable suspicion present to justify extending a traffic stop where a driver was driving a rental car rented by an absent third party, the driver had a one-way rental agreement despite his statement that he planned to return to California in ten days; the rental car smelled of air freshener; the driver was nervous; the officer observed energy drink cans on the floorboard, and; the officer did not believe the driver was truthful about

his employment. *Lilley v. State*, 199 S.W.3d 692, 698 (Ark. App. 2004), *aff'd*, 208 S.W.3d 785 (Ark. 2005).

Here, similar to *Jones* and *Boyce*, the traffic stop was unreasonably prolonged beyond the time necessary to conduct the original traffic investigation, and the facts do not give rise to an objective determination of reasonable suspicion. The traffic stop ended when Trooper May informed Mr. Kim he did not intend to issue a ticket, at which point his purpose for pulling Mr. Kim over was complete. By this time, Trooper May had already performed a background check and completed the necessary tasks associated with the traffic stop. Extending the detention further to conduct additional checks and await arrival of a drug dog was an impermissible prolonging of the stop. Despite the absence of factors which would objectively give rise to reasonable suspicion, Trooper May immediately called for a drug dog following Mr. Kim's denial of consent to search the vehicle. This immediacy, like in *Boyce,* suggests that Trooper May unlawfully based his decision to continue the detention of Mr. Kim on Mr. Kim's assertion of his constitutional right. The only significant event between the time Trooper May stated his non-intent to issue a ticket and the time he called for a drug dog was Mr. Kim's assertion of his constitutional right not to allow Trooper May to search his car; this would suggest that Trooper May based his decision to further detain Mr. Kim on Mr. Kim's refusal to consent.

The only factors Trooper May suggested on dashcam for justification to extend the traffic stop prior to his request to search Mr. Kim's vehicle were Mr.

Kim's supposed nervousness while interacting with the officer, and "just kind of what's going on." However, the dashcam does not portray any nervousness by Mr. Kim, and even if it did, it is not unusual to be nervous while being detained by law enforcement. Additionally, an officer being suspicious of "just kind of what's going on" is not a particularized fact which would lead to the justification for the intrusion upon Mr. Kim's Fourth Amendment right to be free from unreasonable searches and seizures.

Trooper May's later statement to Trooper Blackerby that he suspected criminal activity 30 seconds into the stop because the couple was driving to Las Vegas was bare, conjectural suspicion. From that point forward, Trooper May's primary purpose was to gather information which would support his inchoate hunch and justify the continued detention; consequently, anything Mr. Kim told Trooper May was going to be interpreted to support that pretextual conclusion.

Trooper May detained Mr. Kim for more than thirty minutes, despite the legitimate purpose to the traffic stop concluding after six minutes. This detention length must be considered unreasonable under the circumstances. Thirty minutes is double the time permissible under Ark. R. Crim. P. 3.1. The prolonged detention was not supported by any specific, particularized, or articulable facts which would give rise to reasonable suspicion, and the purpose for the traffic stop had concluded once Trooper May received the results of Sung Kim and Hyun Kim's background checks and decided not to issue a ticket.

c.    Trooper May subjected Sung Kim to an in-custodial interrogation which required reasonable suspicion and the issuance of *Miranda* warnings.

The United States Supreme Court has acknowledged that a motorist who has been detained pursuant to a traffic stop is entitled to the "full panoply of protections prescribed by *Miranda*" if the motorist is subjected to treatment that renders him "in custody" for practical purposes. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). The relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. *Id*. at 442. Police can be said to have seized an individual "if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Lilley* at 697. The Arkansas Supreme Court has recognized that interrogation in a police car is considered a significant factor in finding an individual under custodial interrogation. *Shelton v. State*, 699 S.W.2d 728, 732 (Ark. 1985).

Where an officer instructed a driver to exit his vehicle and sit in the patrol car while he issued a ticket, asked leading questions which commanded a response, and did not expressly or implicitly tell the driver he was free to go after completion of the traffic stop, it was determined that a reasonable person in the driver's situation would not have felt free to leave, and thus, his Fourth Amendment rights were implicated. *Lilley* at 697.

Trooper May initiated the traffic stop after allegedly seeing Mr. Kim driving over the fog line, but almost immediately began questioning Mr. Kim on unrelated matters. Trooper May had already decided not to issue Mr. Kim a ticket when he

questioned Mr. Kim in-depth about his travel plans, requested consent to search the vehicle, and requested the assistance of a drug-detection dog. Mr. Kim could not have believed himself free to go while being detained and interrogated in Trooper May's patrol car, and this circumstance in combination with Trooper May's admission that he was looking for evidence of criminal activity 30 seconds into the traffic stop, supports the finding that Mr. Kim was under in-custodial interrogation and thus, entitled to the protections afforded by *Miranda*. Because the purpose for the stop was completed, Trooper May continuing to detain and question Mr. Kim while awaiting the arrival of a drug-detection dug was unlawful.

## IV. Conclusion

Because the evidence, both physical and verbal, including Mr. Kim's custodial interrogation, were seized or obtained unlawfully, all items of evidence should be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1963).

WHEREFORE, Defendant prays this court grant his motion, and for all other relief the court deems necessary and proper.

Respectfully submitted,

Toney Brasuell
ABA No. 2005579
Attorney for Kim
Brasuell Law Firm
3700 Old Cantrell Road, Suite 102
Little Rock, AR 72202
toney@brasuelllawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was delivered by hand delivery on April 15, 2021 to the following:

Cameron McCree
Asst. U.S. Attorney
425 W Capitol Ave. Suite 500
Little Rock, AR 72201

Toney Brasuell

## EXHIBIT LIST

A. DASHCAM VIDEO
   a. Claimant has included the VLC media player to view the dashcam
      video. To access the dashcam video:
      i. Right-click on "Sung Kim – ACIC Delete.mp4"
      ii. Go to "Open With"
      iii. Click on "VLC media player"
B. INCIDENT REPORT
C. WARNING TICKET
D. A.C.A. § 27-51-302
E. ARK. R. CRIM. P. 3.1



EXHIBIT

A

# Incident Report Form
# Arkansas Uniform

Incident Report Number
5.1.0 A-09/19-0184

## SUMMARY

| Incident Type | Incident Date | Incident Time |
|---|---|---|
| Money Siezure | 9/10/2019 | 07:00:00 |

| Call Location | Call Date | Call Time |
|---|---|---|
| I-40 WB 177mm | 9/10/2019 | 07:00:00 |

| Incident County | Incident Address |
|---|---|
| LONOKE | I-40 WB 177mm |

| Incident City | | Incident State | Incident Zip Code |
|---|---|---|---|
| LONOKE | | AR | 72086 |

| Number of Subjects | Number of Vehicles |
|---|---|
| 2 | 1 |

## SUBJECT 1

The Subject is

## Suspect

| Last Name | First Name | MI | Suffix |
|---|---|---|---|
| KIM | SUNG | W | N/A |

| Address | City | State | Zip Code |
|---|---|---|---|
| 3479 ENNFIELD WAY | DULUTH | GA | 30096 |

| License Status | DL Number | DL State | DL Endorsements | DL Class | DL Restrictions |
|---|---|---|---|---|---|
| Valid license | 053630097 | GA | None | C | None |

| Telephone Number | DOB | Race | | Sex |
|---|---|---|---|---|
| N/A | 8/16/1974 | OTHER | | Male |

| Height | Weight | Hair Color | Eye Color |
|---|---|---|---|
| 5'8 | 180 | BLK - Black | BRO - Brown |

| Employer | Work Number |
|---|---|
| N/A | N/A |

| Work Address | Work City | Work State | Work Zip Code |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Injury Transported | Transported By |
|---|---|
| ☐Yes  ☑No | N/A |

| Hospital Name | Hospital City | Hospital State |
|---|---|---|
| N/A | N/A | N/A |

Additional Information
N/A

EXHIBIT
B
FRMAO 800-631-6989

**S U B J E C T**

The Subject is

# Suspect

| Last Name | | First Name | | | MI | | Suffix | |
|---|---|---|---|---|---|---|---|---|
| KIM | | HYUN | | | J | | N/A | |

| Address | | City | | | State | | Zip Code | |
|---|---|---|---|---|---|---|---|---|
| 3479 ENNFIELD WAY | | DULUTH | | | GA | | 30096 | |

| License Status | | DL Number | DL State | DL Endorsements | | DL Class | | DL Restrictions |
|---|---|---|---|---|---|---|---|---|
| Valid license | | 057348990 | GA | None | | C | | None |

| Telephone Number | | DOB | Race | | | Sex | |
|---|---|---|---|---|---|---|---|
| N/A | | 11/20/1973 | OTHER | | | Female | |

| Height | | Weight | Hair Color | | Eye Color | |
|---|---|---|---|---|---|---|
| 5'5 | | 150 | BLK - Black | | BRO - Brown | |

| Employer | | | | | Work Number | |
|---|---|---|---|---|---|---|
| N/A | | | | | N/A | |

| Work Address | | Work City | | Work State | | Work Zip Code |
|---|---|---|---|---|---|---|
| N/A | | N/A | | N/A | | N/A |

| Injury Transported | Transported By | |
|---|---|---|
| ☐Yes  ☑No | N/A | |

| Hospital Name | | Hospital City | | Hospital State |
|---|---|---|---|---|
| N/A | | N/A | | N/A |

Additional Information
N/A

**V E H I C L E  1**

Vehicle Status

Suspect

| Year | Make | | Model | |
|---|---|---|---|---|
| 2018 | Nissan | | ROGUE | |

| Plate Year | Plate State | | Plate Number | Vehicle Type |
|---|---|---|---|---|
| 2019 | PA | | KLN2387 | Sports Utility Vehicle |

| Vehicle Color | Vehicle Identification Number | | Remarks | |
|---|---|---|---|---|
| SILVER | KNMAT2MV5JP501438 | | N/A | |

| Vehicle Towed | Name of Towing Service | | Address Vehicle Moved To | |
|---|---|---|---|---|
| ☑ Yes | Rich Auto | | 915 W 4th St | |
| ☐ No | City Vehicle Removed To | | State | Zip Vehicle Removed To |
| | Lonoke | | AR | 72086 |

| Insurance | Insurance Carrier | Carrier Address | | Insurance Policy Number |
|---|---|---|---|---|
| ☐Yes  ☑No | N/A | N/A | | N/A |

**N A R R A T I V E**

On Tuesday September 10, 2019 at approximately 7:00 am I conducted a traffic stop near the 178 mile marker of Interstate 40 Westbound, on a silver Nissan Rouge bearing Pennsylvania license plate KLN2387. As I was traveling westbound on Interstate 40 in observed the Silver Nissan Rogue drive onto the inside fog line numerous times violating Arkansas statute 27-51-302.

I made contact with the male driver and female passenger, told them who I was and the reason for the stop. The male passenger told me that he was sneezing which caused him to drive onto the fog line numerous times. I asked him for his driver's license and was presented with a Georgia driver's license identifying him as Sung Won Kim, DOB 8/16/1974 from Duluth, Ga. I determined that the Nissan Rouge was a rental car and was rented by Mr. Kim. I asked Mr. Kim to come back to my car and speak with me while I ran an NCIC/ACIC check of his driver's license.

I asked Mr. Kim about his travel plans and he told me that they were going to Las Vegs, NV for "a couple of days." Mr. Kim then started nervously telling me that they will be playing the slot machines, possible meeting up with friends, and that they only have a "couple hundred bucks" on them. I found this very odd that Mr. Kim immediately started telling me how much money he and his wife had.

While I was confirming the information on the rental agreement, I noticed that it was a one way rental. I asked Mr. Kim about that and he told me that they were going to fly back. I asked Mr. Kim if there were any weapons or guns in the car. Mr. Kim replied that there were no guns in the car, and that they were a Christian family and don't carry guns.

I made contact with the female passenger and asked for her identification. The female passenger gave me her driver's license identifying herself as Hyun Joo Kim, DOB 11-20-73, Ga. DL 061177055. I asked Mrs. Kim about her trip and she told me they were going to Las Vegas to stay for a week. I asked if they were going to take the Silver Nissan Rogue home or fly home and Mrs. Kim told me that she didn't know.

The fact that Mr. Kim told me that they were going to stay 2 days and Mrs. Kim said a week, they did not seem to have any plans on where they were going to stay or how they were going to get home increased my suspicion of criminal activity.

I returned to my vehicle and asked Mr. Kim for consent to search the car. Mr. Kim denied consent search his car by saying "I do not want you to search my car." At 7:06am I called for Tfc. Mark Blackerby to come to with his K-9 Raptor for a K-9 sniff.

While waiting on Tfc. Blackerby and K-9 Raptor to arrive at my location I asked Mr. Kim if they had purchased their plane tickets yet and he replied that they "had not, and maybe his friends had already done that, and he doesn't really know what is going on." This further increased my suspicion of criminal activity.

Tfc. Blackerby and K-9 Raptor arrived on scene at 7:30 am and conducted a sniff of the vehicle. I was told by Tfc. Blackerby that K-9 raptor had alerted to the odor of narcotics in the Silver Nissan Rogue. We explained to Mr. Kim and Mrs. Kim that the dog had alerted and that we would be conducting a probable cause search of the car.

During the probable cause search of the car Tfc. Blackerby and I located a large amount of US currency. The currency was located inside 2 duffle bags and one backpack which were inside of a silver suitcase in the rear of the vehicle. Inside the bags were 4 vacuum sealed bags, all containing large amounts of rubber banded US Currency, as well as a black plastic bag, that contained multiple rubber banded bundles of US currency.

I placed Mr. and Mrs. Kim under arrest and advised them of their Miranda Rights.
After being advised of his Miranda Rights Mr. Kim told me that he had just picked up the bag and was supposed to deliver it. Mr. Kim asked me what was in the car, I told him that it was a large amount of US Currency. He told me that he that it was about $10,000. I told him it was a lot more than that. Mr. Kim then stated that he was being paid $500 to deliver it.

The silver Nissan Rogue was towed to the Lonoke County Sheriff's office by Rich's wrecker service. While at the Sheriff's office the large amount of US Currency was placed into a bank money bag and was sealed.

Task Force Officer Stephen Briggs from the DEA Little Rock office responded to conduct an interview of Mr. and Mrs. Kim. The US currency was given the property control number of P-19-353-HP-A and transported to the First State Bank in Lonoke. The money was counted by bank staff and was determined to be totaling $332,057 US Currency.

| | Rank | Officer Last Name | | Officer First Name | Officer MI | Officer Suffix |
|---|---|---|---|---|---|---|
| **O** | TFC | May | | Andrew | Travis | N/A |
| **F** | Officer Signature | | Officer Department | | | |
| **F** | | | STATE POLICE TROOP A | | | |
| **I** | | | Officer Badge Number | | | |
| **C** | | | | | | |
| **E** | | | 363 | | | |
| **R** | Rank | Supervisor Last Name | | Supervisor First Name | Supervisor MI | Officer Suffix |
| | Sergeant | Johnson | | Alan | N/A | N/A |
| | Supervisor Signature | | Supervisor Department | | | |
| | | | STATE POLICE TROOP A | | | |
| | | | Supervisor Badge Number | | | |
| | | | 98 | | | |

Rev. 1.0.0

## ARKANSAS UNIFORM WARNING

### STATE POLICE TROOP A

| ARKANSAS, COUNTY OF | CITY | WARNING NUMBER |
|---|---|---|
| LONOKE | RURAL LONOKE | ~W004038 |

| | | | Location | |
|---|---|---|---|---|
| | | | I-40 WB | |
| Date: | 9/10/2019 | at approx time: | 07:25 AM | LONOKE |

| | | | Mile No. | 178 | Section No. |
|---|---|---|---|---|---|

| First Name | Middle / Maiden | Last | Suffix |
|---|---|---|---|
| SUNG | WON | KIM | N/A |

**Address**
3479 ENNFIELD WAY

| City | State | Zip Code |
|---|---|---|
| DULUTH | GA | 30096 |

| Driver's License Number | DOB | State Issued | DL in Possession | State |
|---|---|---|---|---|
| 053630097 | 8/16/1974 | GA | YES | GA |

| Sex | Race | Height | Weight | Eyes | Hair | CDL | DL |
|---|---|---|---|---|---|---|---|
| M | A | 5'8" | | BRO | BLK | | ☑ |

| Vehicle License Number | State | Body Type | Commercial Vehicle | Haz Mat |
|---|---|---|---|---|
| KLN2387 | PA | SV | NO | NO |

**Vehicle Description (year, make, model, color)**
2018 NISS Rogue Silver

VIN of Vehicle: KNMAT2MV5JP501438

**Owner's Address**
8201 BARTRAM AVE, PHILADELPHIA, PA 19153

| | | | Work Phone Number |
|---|---|---|---|
| | | | N/A |

| Seatbelt In Use | Crash Involved | 16+ Passenger Commercial Vehicles | AGFC License No. |
|---|---|---|---|
| YES | NO | NO   Number of Passengers  1 | |

| Status | Described |
|---|---|
| 27-51-302 | IMPROPER LANE CHANGE/USAGE |



| Officer Name | Officer ID |
|---|---|
| CPL Travis May | 363 |
| 2nd Officer Name | 2ND Officer ID |



### WARNING
**EQUIPMENT VIOLATIONS SHOULD BE REPAIRED IMMEDIATELY. FAILURE TO DO SO COULD RESULT IN THE ISSUANCE OF A TRAFFIC CITATION.**

---

### PLEASE READ CAREFULLY

You have just been issued a Written Warning for the Offense(s) indicated. You will not be charged with the offense(s) and will not have to pay a fine. However, this written warning may appear on records visible to officers, and could result in an actual citation upon a subsequent traffic stop.

### ARKANSAS LAW ENFORCEMENT REMINDS YOU:

- Seat belts save lives.
- Drinking and driving are a deadly mix.
- Distracted drivers are dangerous drivers.
- Parents and caregivers must secure children in size- and age-appropriate car seats that are properly installed. For more information, go to: *www.carseatsAR.org*





**View the 2019 Arkansas Code** | View Previous Versions of the Arkansas Code

# 2014 Arkansas Code
# Title 27 - Transportation
# Subtitle 4 - Motor Vehicular Traffic
# Chapter 51 - Operation Of Vehicles -- Rules Of The Road
# Subchapter 3 - Driving, Overtaking, and Passing
# § 27-51-302 - Driving on roadways laned for traffic.

**Universal Citation:** AR Code § 27-51-302 (2014)

Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent with this subchapter shall apply:

**(1)** A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety; and

**(2)** Official signs may be erected directing slower-moving traffic to use a designated lane or allocating specified lanes to traffic moving in the same direction, and drivers of vehicles shall obey the directions of every such sign.



Rule 3.1 - Stopping and Detention of Person: Time Limit | Ark. R. Crim. P. 3.1 | Casetext Search + Citator

## casetext

Search all cases and statutes...                    JX

Statutes, codes, and regulations
Arkansas Court Rules
Arkansas Rules of Cri...
Rule 3 - Detention Wi...

# Ark. R. Crim. P. 3.1

⬇ **Download**

As amended through April 2, 2020

Rule 3.1 - Stopping and Detention of Person: Time Limit

A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

*Ark. R. Crim. P. 3.1*

Next Section
Rule 3.2 - Advice as to Reason for Detention

