IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                                 CASE NO. 4:20CV00307 KGB

$332,057.00 IN U.S. CURRENCY                                         DEFENDANT

SUNG KIM                                                               CLAIMANT

### THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO SUNG KIM'S MOTION TO SUPPRESS EVIDENCE

Sung Kim's motion to suppress should be denied. As an initial matter, Mr. Kim's motion is not ripe for adjudication yet because he has not responded in full to the United States of America's special interrogatories after nearly a year. The motion also fails on the merits. The Arkansas State Police trooper involved in the traffic stop at issue in this case pulled Mr. Kim over after the trooper witnessed Mr. Kim cross over the fog line. During the interaction that followed, the trooper learned facts that gave him a reasonable suspicion that there was criminal conduct afoot. That reasonable suspicion was sufficient to extend the traffic stop long enough for a drug dog to come to scene. Once the drug dog alerted, the trooper had probable cause to conduct a search. Under the circumstances of this case, the traffic stop was conducted within a reasonable time. The trooper's interaction with Mr. Kim before the money was found was not a custodial interrogation, so no Miranda warnings were required. And after the money was found, Mr. Kim was advised of his rights before he was questioned further. This Court should not suppress the evidence uncovered during the stop or Mr. Kim's statements.

### BACKGROUND

Arkansas State Police Trooper Andrew "Travis" May is an experienced law enforcement officer. In September 2019, he was a seven-year veteran of the Arkansas State Police. In that time,

he worked on numerous narcotics-related matters. Through his training and experience, he was familiar with various indicators of drug-trafficking activity.

Around 7:00 a.m. on September 10, 2019, Trooper May stopped a silver Nissan Rogue being driven by Mr. Kim. Trooper May conducted the traffic stop after he saw Mr. Kim drive over the inside fog line numerous times, which was a violation of Arkansas Code Annotated Section 27-51-302.[1] Trooper May spoke with Mr. Kim and his passenger, who was later identified as Hyun Kim, his wife. When told about the reason for the stop, Mr. Kim told Trooper May that he was sneezing, which caused him to drive over the fog line numerous times.

Trooper May requested and received a copy of Mr. Kim's driver's license. The license showed that Mr. Kim was from Duluth, Georgia. Trooper May also learned that the Rogue was a rental car that was rented in Mr. Kim's name. As Mr. Kim handed the various documents to Trooper May, he was visibly shaking. At that time, he asked Mr. Kim to join him in his car to talk further. Trooper May explained that it is typically his practice to separate multiple passengers. Trooper May prefers to separate the driver from their vehicle, and he likes to have the ability to run checks on the person with whom he is speaking.

Trooper May had Mr. Kim join him in the front seat of Trooper May's car. Trooper May asked Mr. Kim where he was traveling that day. Mr. Kim said that he and his wife were going to Las Vegas.  Mr. Kim said that they would probably stay two days, even though Mr. Kim wanted to stay for a week. Mr. Kim also volunteered that he did not have much money; he estimated that

---

[1] Trooper May's report mentions that the violation is driving onto the fog line as he explained to Mr. Kim at the beginning of the traffic stop. He described the violation as driving onto the line because he believes the violation starts at that point. Trooper May recalls that Mr. Kim went over the line repeatedly. Because the proof will be that Mr. Kim went over the line, it is not necessary to determine whether driving onto the line is itself a violation of the statute.

they had a couple of hundred dollars. Trooper May took Mr. Kim's statement as a red flag because he answered more than what Trooper May asked and was trying to talk himself out of trouble.

Trooper May also noted that the car was a one-way rental.  Mr. Kim said he rented the car the day before and that they left the Atlanta area around midnight. Mr. Kim said that the plan was to fly home but he did not have the plane tickets yet. Mr. Kim also struggled to explain where he and his wife might stay while in Las Vegas.

Trooper May noted that Mr. Kim's story about the purpose of his travel seemed implausible. Mr. Kim said that the trip was a honeymoon surprise for his wife. After hearing the story about the surprise, Trooper May asked Mr. Kim how long he had been married, and Mr. Kim responded that he had been married for 20 years. Mr. Kim also said that he and his wife had never had a vacation. Trooper May also have thought it strange that the Kims would drive all the way from Georgia to Las Vegas. Mr. Kim explained that his wife wanted to sightsee along the way. Trooper May observed a change in Mr. Kim's facial expression when he was asked questions about his marriage. For example, Mr. Kim was looking down and appeared deflated. Trooper May believed Mr. Kim was searching for a satisfactory answer.

During the exchange about the length of the Kims' marriage and the follow up questions about their travel plans, Mr. Kim made a statement that, "Guess I'm getting a ticket." Trooper May responded that he did not plan to issue a ticket. Trooper May said he just wanted to make sure that the Mr. Kim and his wife were safe. Trooper May said he made the statement as an attempt to address Mr. Kim's apparent anxiousness. Trooper May anticipated asking more questions and wanted to have Mr. Kim calm and clear headed when he responded.

Trooper May asked Mr. Kim if there were any guns or other weapons in the car. Mr. Kim responded that there were no guns in the car and that they were a Christian family and don't carry

3

guns. Shortly after, Trooper May mentioned that he needed to go speak with Mr. Kim's passenger. At that point in the stop, Trooper May had not yet identified her by name or confirmed with her the information Mr. Kim provided regarding their travel.

Before Trooper May went to speak to the passenger, Trooper May ran Mr. Kim's criminal history and learned that Mr. Kim was arrested in 2014 for possession of marijuana; the report did not list a disposition of the charge. Although he cannot pinpoint the exact moment he ran the search, Trooper May knows that he ran the search before speaking to the passenger. Trooper May needed to run the check for his own safety. Mr. Kim was in the front seat of Trooper May's car unrestrained, so Trooper May wanted to know whether he had a past violent history. The search can take some time to accomplish because the names must be run multiple ways and there may be false hits to resolve.

After Trooper May asked Mr. Kim about guns in the car, he went to speak with the passenger. During the interaction, he asked her for identification. The passenger provided a driver's license that showed that her name was Hyun Kim and that she was also from Georgia. Trooper May asked Ms. Kim about their travel plans. Ms. Kim said that they were traveling to Las Vegas and that they would stay for a week. Ms. Kim said that they may drive the car back home or they may fly. Trooper May noticed that where Mr. Kim volunteered unnecessary responses to questions, Ms. Kim was cutting Trooper May off before he could finish asking his questions. Trooper May interpreted that as Ms. Kim giving a pre-set response. Even still, however, Ms. Kim was not certain where in Las Vegas they were going to stay.

After speaking with Ms. Kim, Trooper May went back to his patrol car to run her criminal history. While running Ms. Kim's criminal history, Trooper May explained that he wanted to make

sure "nobody [was] a murderer." Trooper May asked Mr. Kim if he was a murderer and Mr. Kim responded that he was not.

Trooper May asked Mr. Kim for permission to search. Mr. Kim responded that "I do not want you to search my car." Trooper May thought the phrasing of the response was a bit unusual. He also noticed a change in Mr. Kim's body language. Trooper May noticed that Mr. Kim became more rigid and generally exhibited body language that demonstrated that the request for consent caused an emotional response. After this exchange, Mr. Kim asserted that he did not know why he was stopped. Trooper May reminded him of what he explained at the beginning of the traffic encounter – that Mr. Kim was stopped because he drove over the fog line. Trooper May repeated to Mr. Kim the excuse Mr. Kim provided at the start of the stop, which was that he crossed over the fog line because he sneezed.

After that exchange, Trooper May told Mr. Kim that he was calling for a drug-detection dog. While waiting on the drug dog, Trooper May and Mr. Kim discussed further Mr. Kim's criminal history. Mr. Kim explained that he never smoked marijuana before. Trooper May then confronted him with his prior arrest. Mr. Kim said that the drugs were not his. Trooper May and Mr. Kim also discussed further Mr. Kim's travel plans. During that continued conversation, Mr. Kim said that he did not have any plane tickets because he wasn't sure yet if he was going to be out there for two or three days. Mr. Kim also said that he thinks that his wife already bought the tickets or maybe their friends bought them. Mr. Kim also mentioned that he and his wife have two children who are still in school. The children are 16 and 17. The Kims left food for them before they left.

While they were waiting, Trooper May was also still running records checks on Ms. Kim to confirm her story that she did not have any criminal history. Trooper May can hear himself

thinking out loud about a false positive because as he's typing, and he can be heard to say "wrong person." Trooper May also had not issued the warning ticket at that point.

Around this time, approximately 18 minutes into the stop, Trooper May was also in contact with the Trooper Mark Blackerby, who had the drug detection dog. Trooper Blackerby would have arrived by the point, but there was a miscommunication that took him about 15 miles out of the way. Trooper Blackerby and his canine partner Raptor arrived about 31 minutes into the stop. At the time of the traffic stop, Raptor was properly certified and trained to detect an odor of marijuana, methamphetamine, cocaine, and heroin.

Before Raptor examined the car, Trooper May had Ms. Kim get out of the car and stand at the front. Trooper Blackerby and Raptor then conducted their examination of the Kims' car. During that examination, Raptor alerted to an odor of narcotics on the car. After the dog alerted to the car, the officers conducted a probable cause search and found a backpack that appeared to have been locked. While the officers were looking at the bag, Ms. Kim attempted to step to the back of the car and speak with Mr. Kim. The officer stopped her and had her return to the front of the car.

The officers went back to the search. The officers were able to feel something that felt like money in the bag. They opened the backpack to confirm that there was money inside. Inside they found a quantity of cash. A further search uncovered more cash in other pieces of luggage and three cellular devices. The money that officers found, the money that became Defendant Currency, was vacuum sealed. There is not a separate accounting of how much money was found in each location. But in total the Defendant Currency consisted of 47 $1.00 bills, 954 $5.00 bills, 1,369 $10.00 bills, 13,730 $20.00 bills, 169 $50.00 bills, and 305 $100.00 bills.

After the money was found, Mr. and Ms. Kim were handcuffed and read their *Miranda* rights. Trooper May wanted to read them their rights because the large quantity of cash and the

dog alert made it possible that there would be charges. Trooper May also handcuffed them because this encounter was occurring on roadside and he had safety concerns.

When questioned about the money, Mr. Kim first was equivocal whether the money was his or if it belonged to someone else. Mr. Kim eventually admitted that he had just picked up the bag and was supposed to deliver it. Mr. Kim reported that there was about $10,000 in cash in the car and that he was paid $500 to deliver it.

The Arkansas State Police asked the Drug Enforcement Administration ("DEA") to assist in its investigation of the money. DEA Task Force Officer ("TFO") Stephen Briggs responded and spoke with the Kims. Mr. Kim told TFO Briggs that he worked in Georgia as an optician. Mr. Kim also identified the two electronic devices that belonged to him. Shortly after, Mr. Kim told TFO Briggs that he did not wish to submit to an interview and that he wanted to speak with an attorney. After invoking his right to counsel, however, Mr. Kim said, without prompting, that he did not know anything and that he was doing a favor for a friend.

Ms. Kim agreed to speak with law enforcement. Ms. Kim confirmed Mr. Kim's statement about cellular devices when she identified only the third device as hers. Ms. Kim told TFO Briggs that she was a stay-at-home mother. According to Ms. Kim, she and Mr. Kim were on their way to Las Vegas to celebrate their wedding anniversary. Ms. Kim denied knowing that any money was in the car and that she did not know where Mr. Kim could have obtained the money. Ms. Kim expressed doubt that Mr. Kim earned the money as an optician.

After the follow up investigation, the Arkansas State Police seized the Defendant Currency. Shortly after, the DEA adopted the case and conducted an administrative forfeiture proceeding. In his challenge to the administrative forfeiture proceeding, Mr. Kim submitted a claim, asserting that the money belonged to him. Mr. Kim explained the origin of the funds as follows.

> The asset in this matter, is the property of the Claimant, which was obtained by lawful means over the years and not from illegal activity. Claimant purchases, improves, and sells antique vehicles and vehicles that are improved for speed and racing performance. Additionally, Claimant sells an array of goods via local and online marketplaces. Claimant's wife also works and contributes to the family's income. Claimant has provided some titles to vehicles that were readily accessible and Claimant is continuing to gather more such receipts and documentation. Additionally, the currency was not from illegal activity, but was money saved from the family['s] income, sales of antique and performance vehicles and sales of goods to local and online marketplaces.

*Sung Kim Administrative Forfeiture Claim*, attached as Exhibit 1, at 3. There was no mention of the friend that Mr. Kim referenced while on the roadside with Trooper May and to whom he alluded to when concluding his interview with TFO Briggs. Ms. Kim did not submit a claim to any of the money even though she was sent a separate notice letter advising her of her right to do so.

TFO Briggs continued investigating the case after the adoption. As a part of the continued investigation, he obtained warrants to search the three cellular devices recovered from the Kim's car. One of the devices claimed by Mr. Kim included messages that TFO Briggs, an experienced law enforcement officer, interprets as involving the sale of marijuana and the manufacture of crack cocaine. After reviewing the allegations in complaint, Mr. Kim asserts that he did not have enough information to admit or deny if he identified the relevant device as his own. *Answer*, ECF No. 7, at 6 (providing Mr. Kim's responses to paragraphs 48 and 52 of the complaint).

The United States filed this case on March 24, 2020. Under the rules, Mr. Kim had to submit another claim once he appeared in this action. That claim also did not reference the story Mr. Kim told Trooper May on the roadside on the day of the seizure. Mr. Kim's claim asserts, under oath, that all of the money belongs to him. *Claim*, ECF No. 4, at 1. And again, Ms. Kim did not submit a claim despite receiving a notice of her right to challenge the forfeiture proceedings.

In June 2020, the United States sent Mr. Kim special interrogatories to explore further Mr. Kim's story about his relationship to the Defendant Currency. Mr. Kim did not participate in

discovery, so the United States had to pursue an order compelling him to respond. *Motion to Compel*, ECF No. 9. After he did not respond to the Court's August 19, 2020, order commanding him to answer (ECF No. 12), the United States sought to strike him from this action. *Motion to Strike*, ECF No. 13. Mr. Kim still did not respond; in fact, he remained silent until the day of the December 16, 2020, hearing on the motion to strike. Mr. Kim blamed his failures to respond on his prior counsel; a charge his prior counsel denied. Mr. Kim and his former counsel were uncertain during the hearing whether they would continue working together after Mr. Kim's allegation. In fairness to Mr. Kim, the Court deferred ruling on the motion to strike and directed the parties to file a status report by January 8, 2021. *See Order*, ECF No. 16, at 1.

Mr. Kim eventually provided partial responses on January 8, 2021. *See Joint Status Report*, ECF No. 17, at 1. In his responses, Mr. Kim asserted that the money belonged to him and his wife. *Kim's Compelled Answers to Special Interrogatories*, attached as Exhibit 2, at 3-4. He claimed that substantial portions of the money were given to him by his now-deceased father. *Id*. Mr. Kim also asserted that while he thought his mother could confirm that the gift occurred, he was not sure if she would know of the exact amount of the gift. *Id*. at 4. Mr. Kim acknowledged in his answers that he gave a different story to Trooper May on the roadside. *Id*. at 10-11. He attempted to explain the shifting story by asserting that he lied because he was nervous and afraid for his life. *Id*.[2]

The United States withdrew its motion to strike in a good-faith effort to work with Mr. Kim (who was pro se at that time) to resolve this case on the merits. *McCree Letter to Kim dated March*

---

[2] Notably, Kim asserts in his motion to suppress that he wasn't nervous during the stop and that he was laughing and joking. Although the United States also notes the joking tone of his voice, the United States maintains its allegation that Mr. Kim was nervous during the stop, as evidenced by his shaky hand when giving documents to Trooper May and his body language throughout the stop. Mr. Kim's shifting story about the facts, however, should be considered when assessing his credibility.

*4, 2021*, attached as Exhibit 3, at 1 n.1. In its request to withdraw its motion to strike, the United States noted that the answers were incomplete. *Joint Status Report*, ECF No. 17, at 1. The deficiencies include the following: (1) failing to identify how much of the Defendant Currency belongs to Ms. Kim and how much belongs to Mr. Kim (especially considering Mr. Kim's sworn statement in his claim, ECF No. 4, that all of the money is his),[3] (2) failing to explain fully the source of the money (his explanation only goes back to his marriage when he and Ms. Kim allegedly had already earned $50,000 to $60,000), (3) omitting the identity and contact information for some key people who could corroborate his latest explanation for the origin of the money, and (4) leaving out any discussion of Mr. Kim's authority to act on Ms. Kim's behalf in pursuing the return of any funds that belong to her. *See McCree Letter to Kim dated March 4, 2021*, Exhibit 3, at 1-3 (detailing all the issues the United States asked Mr. Kim to address by May 4).

The United States asked Mr. Kim to address the deficiencies in his special interrogatories by April 5. *Id*. at 1. Days before the deadline, Mr. Kim asked for a 30-day extension of time in which to respond, citing his counsel's need to get up to speed on the case. *Brasuell Emails with McCree on April 1, 2021*, attached as Exhibit 4. At 1-2. The United States agreed to extend the deadline to May 4. *Id*. at 1[4] Since that time, Mr. Kim has moved to suppress the evidence uncovered during the traffic stop. *Motion*, ECF No. 28. Mr. Kim has not yet provided his supplemental responses to the special interrogatories.

---

[3] Georgia is not a community property state. *See Brown v. Little*, 489 S.E. 2d 596, 598 (Ga. App. 1997) ("The trial court apparently assumes that all funds brought into a marriage are jointly owned by both spouses. However, Georgia has never subscribed to a community property theory regarding assets acquired during marriage while the marriage exists.").

[4] The United States advised Mr. Kim that given the substantial amount of time since the requests were served and Mr. Kim's behavior so far in discovery, it was likely the United States would not agree to further extensions of the deadline. *Id*.

10

## **DISCUSSION**

Mr. Kim's suppression motion should be denied. The motion is premature; Mr. Kim must provide full responses to the United States's special interrogatories before he can seek any relief from the Court. If considered now, though, the motion would fail on the merits. The money was found after Trooper May witnessed a traffic violation. During the legitimate stop, Trooper May learned information that gave him reasonable suspicion to extend the stop to wait for a dog to arrive. And when the properly trained and certified dog alerted to an odor of narcotics in the car, Trooper May had probable cause to start the search that led to the discovery of the Defendant Currency. Mr. Kim was not in custody prior to the discovery of the money, so no Miranda warnings were required. Trooper May advised Mr. Kim of his *Miranda* rights before questioning him about the money found during the search, so those statements should not be suppressed either.

1. **Sung Kim's motion to suppress is premature because he has yet to provide full and complete responses to the United States's special interrogatories.**

Under the civil rules governing forfeiture actions, a claimant must respond to special interrogatories before seeking any relief from the Court. Fed. R. Civ. P. Supp. R. G(6)(c) (prohibiting the claimant from seeking dismissal of the action until after responding to special interrogatories); *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197-98 (2d Cir. 2014) (explaining that special interrogatories are a part of determining the claimant's standing and until the claimant establishes his standing to be a party to the action the claimant lacks the right to bring any motion and that the claimant is a "stranger to the litigation"); *United States v. $1,106,775 in U.S. Currency*, No. 3:20CV00158, 2020 WL 6930103 (D. Nev. 23, 2020) (where claimant failed to adequately respond to special interrogatories seeking information related to claimants' standing, court denied without prejudice claimants' motion to suppress evidence obtained during the traffic stop that resulted in seizure of the defendant currency); *see also United States v. $284,950.00 in*

*U.S. Currency*, 933 F.3d 971, 974 (8th Cir. 2019) (explaining that a motion to strike must be decided before any motion  ("An 'evasive or incomplete disclosure, answer, answer, or response' to an interrogatory constitutes a failure to answer.") (applying Rule 37(a)(4) of the Federal Rules of Civil Procedure).

This case presents a genuine standing dispute——Mr. Kim has provided varying stories, about his relationship to the money. Where standing is a live issue, the appropriate way to resolve the factual concerns is through special interrogatories. *$284,950.00 in U.S. Currency*, 933 F.3d at 974-75.  In *$284,950.00*, the claimant from whom the money was seized provided vague answers about how much of the Defendant Currency he claimed to own and who owned the rest of the money. *Id.* at 975. That deficiency, and others, justified an order striking the claimant from the action. *Id.* Mr. Kim is in a similar position. He has provided varying stories about his relationship to the Defendant Currency. And his latest answers suggest that he is representing the interests of his wife. And on the date of the seizure, his wife denied any knowledge of the money. Here, resolution of the standing issues is essential to ensure that a person with no ownership stake cannot challenge the forfeiture.

On March 4, 2021, the United States asked Mr. Kim to address the deficiencies in his responses by April 5, 2021. *McCree Letter to Kim dated March 4, 2021*, Exh. 3, at 1. On March 22, 2021, Mr. Kim served his first set of discovery requests on the United States. On April 1, 2021, Mr. Kim requested a 30-day extension for his discovery responses, citing his new counsel's need to get up to speed on this case. *Brasuell Emails with McCree on April 1, 2021*, Exh. 4, at 1. The United States agreed to move its deadline to May 4, but advised that given the history of this case, the United States was unlikely to agree to any further extensions of time. *Id*. Days later, Mr. Kim

filed his motion to suppress. *Motion*, ECF No. 28, at 1. As of the filing of this response, Mr. Kim has not yet submitted his supplemental answers.

If Mr. Kim responds fully and adequately by the May 4 deadline, the United States intends to file a notice, advising the Court of that development. If Mr. Kim does not provide full and adequate responses by the extended deadline, the United States anticipates renewing its motion to strike. And where the Court is presented with both a motion to strike and a motion to suppress, the Court is entitled to resolve the motion to strike first. *See $284,950.00 in U.S. Currency*, 933 F.3d at 975. If the Court grants the motion, Mr. Kim's motion to suppress would be moot because Mr. Kim would no longer be a party who could assert a challenge to the forfeiture proceedings. *Id.* (affirming the denial of the claimant's motion to dismiss because once the claimant's claim was dismissed, the claimant had "no 'legally cognizable interest in the outcome' of the forfeiture action, and his motion to dismiss [was] moot") (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

Also outstanding are Mr. Kim's answers to the United States's first set of Rule 33 interrogatories and Rule 34 requests for production of documents and its first set of requests for admission. Those answers are due on May 4 as well. Even if Mr. Kim responds to all the outstanding requests by the current deadline, the United States would ask that he Court defer resolution of the motion to suppress until all discovery, including depositions, is complete. The rules do not mandate that result, but the Court has the power to take that route, if it determines that doing so is just. *Johnson v. Moody*, 903 F.3d 766, 772 (8th Cir. 2018) (explaining that the district court enjoys "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery") (internal citation omitted). The United States submits that allowing discovery to proceed is in the interests of justice. The outstanding requests will provide the Court with the best

picture of what occurred during the stop and provide additional information that will assist the Court when it weighs the credibility of the witnesses. The prejudice to Mr. Kim is low; as explained below, his motion would fail even if it is considered on the merits.

### 2. Trooper May witnessed a traffic violation.

A traffic stop, which is a warrantless seizure of the occupants of the vehicle, is reasonable under the Fourth Amendment as long as the officer conducting the stop has proof that the vehicle has committed a traffic violation. *United States v. Pulliam*, 265 F.3d 736, 739 (8th Cir. 2001). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hanel*, 993 F.3d 540, ___ (8th Cir. April 2, 2021) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994)).[5] "Probable cause [also] exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (quoting *United States v. Andrews*, 454 F.3d 919, 921 (8th Cir. 2006)); *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005), abrogated on other grounds by *Rodriguez v. United States*, 575 U.S. 348 (2015) (holding that the issue is not whether there was an actual violation "but whether an objectively reasonable police officer could have formed a reasonable suspicion that [the driver] was committing a code violation").

Here, Trooper May observed Mr. Kim's vehicle swerving over the fog line, and he told Mr. Kim that at the start of the stop. Mr. Kim told Trooper May that the reason he swerved was because he sneezed. Later in the stop, after Trooper May informed Mr. Kim that a drug dog would come to the scene, Mr. Kim pretended that he did not know why he was being stopped. Trooper May reminded him of the discussion they had earlier in the stop. Under these facts, the Court

---

[5] As of this filing, the *Hanel* case does not have any pinpoint citations on Westlaw.

should find that a traffic violation occurred and that the stop was justified under the Fourth Amendment; however, if the Court determines that no actual violation occurred, the Court should nonetheless find that the stop was justified because Trooper May reasonably believed that he witnessed a violation.

### 3. Trooper May's questions about the Kims identities, criminal histories, and travel plans were within the scope of a routine traffic stop.

"After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (quoting *United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004)). Those routine activities include "running a computerized check of the vehicle's registration and insurance; running a similar check of the occupant's identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their destination, route, and purpose." *United States v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021) (quoting *United States v. Murillo-Salgado*, 854 F.3d 407 (8th Cir. 2014)).

Mr. Kim contends that the stop in his case had to end once Trooper Mfay told Mr. Kim that he was not going to issue him a ticket. That position is not supported by the law. *See Cox*, 992 F.3d at 709. In *Cox*, the trooper stopped a vehicle after observing the vehicle driving too closely to the car in front of it. *Id*. at 708. When the trooper first approached the car, he explained that he did not plan to issue a ticket, but he still wanted to see the driver's identification and a copy of the rental agreement and asked the driver and passenger about their line of work and travel plans. *Id*. The trooper also conducted a check of the men's criminal histories. *Id*. The officer became suspicious after observing the driver and passenger's nervousness and demeanors and hearing them tell inconsistent stories about the purpose of their travel, so he asked for and received consent

to conduct a search. *Id*. at 710. That search uncovered a large quantity of cocaine. *Id*. at 710. The defendant challenged the search, arguing that the officer had no right to ask the questions that led him to seek consent. *Id*. at 710. The Eighth Circuit rejected that argument after it concluded that even though the officer did not intend to issue a ticket, "the officer may still conduct certain routine tasks related to the traffic violation, including 'running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their destination, route, and purpose.'" *Id*. (citing *United States v. Murillo-Salgado*, 854 F.3d 407, 414-15 (8th Cir. 2017)).

This case falls squarely within the facts presented in *Cox*. Trooper May conducted routine questioning of a motorist after witnessing the motorist commit a traffic violation. Trooper May, concerned about the motorist's ability to operate the car safely, sought to identify the motorist and his passenger and learn more about their travel. During the course of his conversation with the driver, and before Trooper May could identify the passenger and have a separate conversation with her, Mr. Kim expressed concern that he was about to get a ticket. It was only then that Trooper May mentioned that he would not give Mr. Kim a ticket. But Trooper May still intended to continue his routine questioning. That approach is permitted under the law.

4. **The information Trooper May learned during the traffic stop gave him reasonable suspicion to extend the stop to wait for a drug dog to come to the scene.**

An officer may extend the scope of a traffic stop if the officer has a reasonable suspicion that criminal activity is afoot. *Cox*, 992 F.3d at 710. "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Roberts,* 787 F.3d 1204, 1209 (8th Cir. 2015). To establish reasonable

suspicion, the officer must be able to point to "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Donnelly*, 475 F.3d 946, 952 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "The Supreme Court has repeatedly reminded that the concept of reasonable suspicion is composed of 'commonsense' and 'nontechnical' concepts instead of 'finely-tuned standards,' and determining whether there is reasonable suspicion depends on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Dillard*, 825 F.3d 472, 474–75 (8th Cir. 2016) (quoting *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996)).

"Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." *United States v. Gill,* 513 F.3d 836, 844 (8th Cir.2008). "Whether [the officer's] suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). The Eighth Circuit has instructed that law enforcement officers should be given "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). This deference is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005).

Reasonable suspicion may be based on things known before the start of the traffic stop or based on information learned during the stop. *Cox*, 992 F.3d at 710. ("If the responses and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his

inquiry and satisfy those suspicions.") (quoting *United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004)). Further, the extended inquiry can include a conversation with the "vehicle's passengers to verify [the information provided by the driver] and conflicting stories may provide justification to expand the scope of the stop.". *Id.* The factors cited by the United States to establish an officer's reasonable suspicion do not have to prove that the motorist is probably guilty or address innocent explanations. *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011). In fact, "factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *Id*. When conducting its analysis, district courts should avoid engaging in a "divide-and-conquer analysis." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

Here, Trooper May learned enough information during the stop to justify his extension of the stop for a brief time to allow the drug dog to come to the scene. Several factors in the present case demonstrate that Trooper May had articulable facts that justified his suspicions and his inferences from those facts were reasonable in light of his training and experience. Specifically, reasonable suspicion existed here because the Kims presented Trooper May with an implausible travel itinerary, their stories were inconsistent with each other, Mr. Kim had a prior drug offense, Mr. Kim appeared to be shaking when handed documents to Trooper May, and Mr. Kim's demeanor left Trooper May with the impression that Mr. Kim had something he was trying to hide.

First, Trooper May observed Mr. Kim visibly shaking when handing him documents, and the trooper noted that the shaking appeared to be more than what the trooper would expect from a typical motorist in this circumstance. Trooper May also noted changes in Mr. Kim's body language at various points during his conversation with Mr. Kim. For example, when Trooper May asked Mr. Kim why he and his wife were traveling to Las Vegas, Mr. Kim said it was a honeymoon trip.

Trooper May followed up that question with an inquiry about how long the Kims had been married. Mr. Kim appeared deflated when he admitted that this honeymoon trip was coming 20 years into his marriage. Similarly, when Trooper May asked for Mr. Kim's consent to search, Trooper May noticed that Mr. Kim's body language demonstrated that the request elicited an emotional response. Admittedly, "[n]ervousness alone does not constitute reasonable grounds for suspicion", but it is a factor this Court can and should consider in its analysis. *United States v. Miller*, 20 F.3d 926, 930 (8th Cir. 1994) (citing *United States v. Tapia*, 912 F.2d 1367, 1371 (11th Cir. 1990)); *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (holding that nervousness, difficulty answering basic questions about an itinerary, and failure to be forthright about criminal history was sufficient to constitute reasonable suspicion).

The Eighth Circuit has recognized that implausible travel plans and inconsistent stories are also factors that this Court should include in its analysis. See *Cox*, 992 F.3d at 710 (concluding that a trooper had reasonable suspicion after he observed the motorists' nervousness and demeanors and heard their inconsistent stories about the plan for their travel); *Riley*, 684 F.3d at 763-64 (holding that the driver's vague and conflicting answers to simple questions about his trip were legitimate factors the officer could consider when developing reasonable suspicion); *United States v. Carpenter*, 462 F.3d 981, 986-87 (8th Cir. 2006) (crediting an officers doubt about the defendant's implausible explanation for exiting the highway after passing ruse check point signs); *United States v. Lebrun*, 261 F.3d 731, 734 (8th Cir. 2001) (concluding that inconsistent answers regarding details of a trip could support a finding of reasonable suspicion); *United States v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000) (holding that inconsistent answers regarding the purpose and details of the trip supported a finding of reasonable suspicion).

In this case, the Kims gave Trooper May an implausible story, and the details the Kims provided were inconsistent with each other. The Kims were driving in a one-way rental with no clear plan on how they were going to return home. They were traveling on a Tuesday morning, supposedly taking a honeymoon trip after 20 years of marriage, while their teenaged children were left home to fend for themselves during a school week. Mr. Kim volunteered that they only had $200 on them (which was unusual given the context of the conversation), they gave inconsistent statements regarding how long they were going to stay (Mr. Kim indicated more than once that it would only be two or three days, while Ms. Kim reported it would be for a week), and Mr. Kim was not clear on whether they were meeting friends in Las Vegas or not. Mr. Kim also said that they had not bought the plane tickets to fly home yet and that his wife or their friends in Las Vegas may have already bought the tickets. The Kims' case is substantially similar to *Cox* with respect to the inconsistency. There the driver and passenger agreed that they were hunting a fugitive. The driver reported that they were traveling to Virginia and that they planned to stay there for three days, while the passenger said that they would only stay for a day. *Cox*, 992 F.3d at 708-09. The passenger also could not recall the name of the fugitive they were tracking. *Id*. at 709. The Eighth Circuit noted that the inconsistency was sufficient to warrant further inquiry. *Id*. at 710. The same result should occur here. And similar to the officer in Carpenter, Trooper May was entitled to be skeptical of the implausible story the Kims told him about their travel plans and to use that skepticism in the development of his reasonable suspicion. *Carpenter*, 462 F.3d at 986-87.

Mr. Kim's criminal history is another factor that Trooper May and this Court can and should consider in analyzing whether reasonable suspicion existed. *See, e.g., United States v. Shafer*, 608 F.3d 1056, 1062-63 (8th Cir. 2010); *United States v. Cornelius*, 391 F.3d 965, 967

(8th Cir. 2004). Here, a criminal history check uncovered that 5 years prior to the traffic stop, Mr. Kim had been arrested for possession of marijuana.

Finally, the reported origin and destination of the Kims' travel is important to consider in the analysis. *United States v. Coleman*, 603 F.3d 496, 500 (8th Cir. 2010). The Kims were traveling from Georgia, a state that typically receives drugs from a source state and that they were traveling to Las Vegas, a source location for drugs. They were also traveling on Interstate 40, a known drug corridor.

When considered together, in light of Trooper May's training and experience, these factors establish a reasonable suspicion that justified the extension of the traffic stop long enough for a drug-detection dog to come to scene.

### 5. The alert by the properly trained and certified drug detection dog gave Trooper May probable cause to search the Kims' vehicle.

An officer conducting a traffic stop can search the vehicle, if the officer has probable cause to believe that the search will uncover evidence of criminal activity. *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011) (finding probable cause for the search of the entire vehicle where law enforcement smelled the distinct odor of burnt marijuana emanating from the vehicle) (internal citations and omitted); *United States v. Davis*, 569 F.3d 813, 815, 817-18 (8th Cir. 2009) (finding probable cause justified a warrantless search under the automobile exception where a police officer smelled the odor of marijuana as he approached a vehicle, asked the driver to exit the vehicle, performed a pat-down search of the driver, and discovered a lump, which the driver admitted was marijuana); *United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999) (stating "detection of the smell of burnt marijuana . . . gave [the officer] probable cause to search the entire vehicle for drugs")). "It is well settled law that a dog's alert during a canine search "of a vehicle provides probable cause that drugs are present in the vehicle, thereby justifying a search of the vehicle." *Id.*

(quoting *United States v. Mohamed,* 600 F.3d 1000, 1004 (8th Cir.2010); *United States v. Bloomfield,* 40 F.3d 910, 919 (8th Cir.1994) (en banc)).

### 6.   The traffic stop was conducted within a reasonable time.

The 30 minutes it took to get the drug dog to the scene was not unreasonable under the Fourth Amendment. The Eighth Circuit says the relevant period to consider is period between the completion of the routine traffic stop and the drug dog's alert. *United States v. Englehart*, 811 F.3d 1034, 1041 (8th Cir. 2016). Here, that period was of a permissible length. Trooper May did not complete his routine questioning until around 28 minutes and 10 seconds into the stop (once he stopped asking questions and finished printing documents), which was just minutes before the dog arrived, which was around 31 and a half minutes into the stop. The dog alerted by 33 and a half minutes into the stop. The 5-minute-and-20-second delay here is far shorter than the 45-minute delay the Eighth Circuit has determined to be reasonable. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005).

Arkansas's rules criminal procedure do not control in this federal proceeding, but even if they did, there was no violation of Arkansas law. First and foremost, the question here is whether this traffic stop complied with the Fourth Amendment, not whether it comported with Arkansas law. *See United States v. Wheelock*, 772 F.3d 825, 830 (8th Cir. 2014) (holding that an alleged violation of state law is an insufficient basis on which to suppress evidence in federal court absent proof that there has also been a violation of the Fourth Amendment). Even if the state rules of procedure controlled, they would not justify suppression here. Under the Arkansas Rules of Criminal Procedure, the officer may detain an individual for a period that is reasonable under the circumstances. Ark. R. Crim. P. 3.1. Arkansas courts have recognized that the rule is not violated during a traffic stop when the officer acts diligently the officer requests the assistance from the

nearest drug detection dog, and the dog arrives within an hour. *See Hoey v. State*, 519 S.W. 3d 745, 756 (Ark. App. 2017) (rejecting a challenge to the length of a traffic stop after noting that the officer on the scene acted diligently to secure the nearest drug dog and that the dog arrived in less than an hour). Here, Trooper May also asked for the nearest dog, and the dog arrived approximately 30 minutes into the stop and alerted about 3 and a half minutes later. Under *Hoey*, that is soon enough under the circumstances. So even if Arkansas Rule 3.1 controlled the outcome of the federal case (and it does not), it would not be a reason to order suppression in this case.

### 7. Sung Kim was not in *Miranda* custody before Trooper May found the Defendant Currency.

Mr. Kim contends that his statements after the six-minute mark should be suppressed because he was not read his *Miranda* rights. Mr. Kim's argument fails. *Miranda* only applies to custodial interrogations. *United States v. Diaz*, 736 F.3d 1143, 1149 (8th Cir. 2013). In analyzing whether a person was in *Miranda* custody at the time of an interview, "[t]he ultimate question is whether a reasonable person would feel free to leave under the totality of the circumstances, that is, 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Holleman*, 743 F.3d 1152, 1159 (8th Cir. 2014) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

In the context of a roadside traffic stop, the Eight Circuit has recognized that "[a]lthough stopped drivers are detained, they are generally not in custody during the roadside questioning that is permitted during a traffic stop." *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2021). Important factors to consider are the location of the questioning, the number of officers present, whether the motorist was handcuffed during the questioning, and whether the motorist was told that his detention would continue after the traffic stop. *Id*. at 377.

As an initial matter, the United States does not concede that the legitimate purpose for the traffic stop was completed six minutes into the stop. As discussed in Section 3 above, Trooper May's routine questions about the Kims' travel plans and criminal histories was a part of the traffic stop. *Cox,* 992 F.3d at 710.

In addition, an examination of the circumstances of Mr. Kim's traffic stop shows that he was not in Miranda custody before the Defendant Currency was found. First, similar to *Soderman*, although the questioning occurred in a patrol car, prior to the discovery of the Defendant Currency, Mr. Kim was not put in the locked backseat, nor was he placed into handcuffs. "He thus retained a degree of free movement, as reflected by his frequent gestures, body movement, and statements, and was not constrained to the degree associated with a formal arrest." *Soderman*, 983 F.3d at 377.

The number of officers suggests that Mr. Kim was not in custody. In Mr. Kim's case, there was only one officer present during the questioning until the canine officer arrived. And at that point, there were only two officers on scene. It is well established that the presence of only one or two officers is a factor that cuts against a finding that the motorist was custody. *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 438-39 (1984)).

Prior to finding the Defendant Currency, there was no indication that Mr. Kim's detention would continue after the traffic stop was completed. When Trooper May decided that a drug dog needed to come to the scene, he told Mr. Kim that a positive alert would provide probable cause for a search, but again, he did not assert that Mr. Kim would be arrested. Under these facts, this factor also indicates that Mr. Kim was not in custody prior to the discovery of the Defendant Currency. *Id*.

Mr. Kim was not in *Miranda* custody before the money was found.

24

**8. The statements Sung Kim gave after the money was found should not be suppressed because Sung Kim was advised of his *Miranda* rights before he gave the statements.**

Once a person is advised of their *Miranda* rights, the person must take some affirmative action to avail themselves of Miranda's protections. *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) (holding that a defendant seeking to invoke his right to remain silent must "indicate a clear, consistent expression of a desire to remain silent") (cleaned up); *United States v. Havlik*, 710 F.3d 818, 821 (8th Cir. 2013) (requiring a clear and unequivocal invocation of the right to have an attorney present before law enforcement is barred from further questioning).

Here, the video shows that immediately after the money was found, Trooper May read the Kims their rights. At no point did Mr. Kim attempt to invoke his right to counsel or to remain silent. He freely and voluntarily answered questions. Those statements were made with the benefit of *Miranda* warnings, so there was no *Miranda* violation.

## <u>CONCLUSION</u>

Sung Kim's motion to suppress should be denied as prematurely filed. Even when considered on the merits, the motion fails because the traffic stop was conducted consistent with the requirements of the Fourth Amendment, and the questioning of Mr. Kim complied with the mandates of *Miranda*.

JONATHAN D. ROSS
Acting United States Attorney

By:  CAMERON C. McCREE (2007148)
AMANDA JEGLEY (2010045)
Assistant U.S. Attorneys
P.O. Box 1229
Little Rock, Arkansas 72203
(501) 340-2600
Cameron.McCree@usdoj.gov
Amanda.Jegley@usdoj.gov