THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                             PLAINTIFF

v.                          Case No. 4:20-cv-00307-KGB

$332,057.00 IN UNITED STATES CURRENCY                                DEFENDANT

**ORDER**

Before the Court is claimant Sung Kim's motion to suppress evidence (Dkt. No. 28). The United States filed a response in opposition to the motion (Dkt. No. 30), and Mr. Kim filed a reply (Dkt. No. 31). For the reasons discussed herein, the Court denies Mr. Kim's motion (Dkt. No. 28).

**I.     Background**

This Court, when considering the pending motion, reviewed the dashcam video provided (Dkt. No. 29). Based on this Court's review of the video and the parties' briefing, the Court recites this factual background. On September 10, 2019, at approximately 7:00 a.m., Arkansas State Police Trooper Andrew May conducted a traffic stop on a silver 2018 Nissan Rogue (Dkt. No. 28, at 2). Mr. Kim was the driver of the vehicle, and the only passenger in the vehicle was Mr. Kim's spouse, Hyun Jung Kim (*Id.*). The United States maintains that Trooper May conducted the traffic stop after seeing Mr. Kim drive over the inside fog line multiple times (Dkt. No. 30, at 2). Trooper May approached the vehicle at the passenger side window (Dkt. No. 28, at 2). When told about the reason for the stop, Mr. Kim told Trooper May that he was sneezing, which caused him to drive over the fog line (Dkt. No. 30, at 2).

Trooper May requested and received a copy of Mr. Kim's driver's license (*Id.*). The license showed that Mr. Kim was from Duluth, Georgia (*Id.*). Trooper May also learned that the Rogue was a rental car that was rented in Mr. Kim's name (*Id.*). The rental agreement showed that the

vehicle had been rented on September 9, 2020, to be driven to Las Vegas (Dkt. No. 28. at 30). The dash cam video shows the exterior of the rental vehicle and records all audio. According to Trooper May, as Mr. Kim handed the various documents to Trooper May, he was visibly shaking (Dkt. No. 30, at 1). At that time, Trooper May asked Mr. Kim to join him in his car to talk further (*Id.*). According to the United States, Trooper May's typical practice is to separate multiple passengers (*Id.*). Trooper May prefers to separate the driver from the vehicle, and he likes to have the ability to run checks on the person with whom he is speaking (*Id.*).

Trooper May had Mr. Kim join him in the front seat of Trooper May's car (*Id.*). Trooper May asked Mr. Kim where he was traveling that day (*Id.*). Mr. Kim said that he and his wife were going to Las Vegas (*Id.*). Mr. Kim said that they would probably stay two days, even though Mr. Kim wanted to stay for a week (*Id.*). Mr. Kim stated that the trip was a honeymoon surprise, but he also acknowledged that he and Ms. Kim had been married over 20 years and had never been on a vacation (Dkt. No. 23, at 3-4). Mr. Kim also volunteered that he did not have much money; he estimated that they had a couple hundred dollars (Dkt. No. 30, at 2-3).

Trooper May noted that the car was a one-way rental (*Id.*, at 3). Mr. Kim said that he rented the car the day before and that they left the Atlanta area around midnight (*Id.*). Mr. Kim said that their plan was to fly home, but he did not have the plane tickets yet (*Id.*). Mr. Kim stated that they drove to Las Vegas to sightsee along the way (Dkt. No. 28, at 4). Mr. Kim stated that he was not sure where they intended to stay during their trip, but he stated that he thought they were staying at the Aria hotel (*Id.*). The United States asserts that Trooper May observed a change in Mr. Kim's facial expression when he was asked questions about his marriage, looking down and appearing deflated (Dkt. No. 30, at 3).

During the exchange about the length of the Kims' marriage and the follow up questions about their travel plans, Mr. Kim made a statement, "Guess I'm getting a ticket" (*Id.*). Trooper May responded that he did not plan to issue a ticket (*Id.*). According to the United States, Trooper May said that he just wanted to make sure that Mr. Kim and his wife were safe (*Id.*). Trooper May states that he made the statement as an attempt to address Mr. Kim's apparent anxiousness (*Id.*). Trooper May anticipated asking more questions and wanted to have Mr. Kim calm and clear headed when he responded (*Id.*).

Trooper May asked Mr. Kim if there were any guns or other weapons in the car (*Id.*). Mr. Kim responded that there were no guns in the car and that they were a Christian family and did not carry guns (*Id.*, at 3-4). Shortly after, Trooper May mentioned that he needed to go speak with Mr. Kim's passenger (*Id.*, at 4). At that point in the stop, Trooper May had not yet identified her by name or confirmed with her the information Mr. Kim provided regarding their travel (*Id.*).

Before Trooper May went to speak to the passenger, Trooper May ran Mr. Kim's criminal history and learned that Mr. Kim was arrested in 2014 for possession of marijuana; the report did not list a disposition of the charge (*Id.*). Although he cannot pinpoint the exact moment that he ran the search, Trooper May knows that he ran the search prior to speaking to the passenger (*Id.*). According to the United States, Trooper May needed to run the check for his own safety (*Id.*). Mr. Kim was in the front seat of Trooper May's car unrestrained, so Trooper May wanted to know whether he had a past violent history (*Id.*). The search can take some time to accomplish because the names must be run multiple ways and because there may be false hits to resolve (*Id.*).

After Trooper May asked Mr. Kim about guns in the car, Trooper May went to speak with the passenger (*Id.*). During the interaction, he asked her for identification (*Id.*). The passenger provided a driver's license that showed her name was Hyun Kim and that she was also from

Georgia (*Id.*). Trooper May asked Ms. Kim about their travel plans (*Id.*). Ms. Kim said that they were traveling to Las Vegas and that they would stay for a week (*Id.*). Ms. Kim said that they may drive the car or fly back (*Id.*). According to the United States, Trooper May noticed that where Mr. Kim volunteered unnecessary responses to questions, Ms. Kim was cutting Trooper May off before he could finish asking his questions (*Id.*). Ms. Kim was not certain where in Las Vegas they were going to stay (*Id.*).

After speaking with Ms. Kim, Trooper May went back to his patrol car to run her criminal history (*Id.*). While running Ms. Kim's criminal history, Trooper May explained that he wanted to make sure "nobody [was] a murderer." (*Id.*, at 4-5). Trooper May asked Mr. Kim if he was a murderer, and Mr. Kim responded that he was not (*Id.*, at 5).

Trooper May asked Mr. Kim for permission to search his car (*Id.*). Mr. Kim responded, "I do not want you to search my car." (*Id.*). According to the United States, Trooper May thought the phrasing of Mr. Kim's response was a bit unusual (*Id.*). Trooper May also noticed a change in Mr. Kim's body language (*Id.*). Allegedly, Mr. Kim became more rigid and generally exhibited body language that demonstrated to Trooper May that the request for consent caused an emotional response (*Id.*). After this exchange, Mr. Kim asserted that he did not know why he was stopped (*Id.*). Trooper May reminded Mr. Kim of what he explained at the beginning of the traffic encounter—that Mr. Kim was stopped because he drove over the fog line (*Id.*). Trooper May repeated to Mr. Kim the excuse Mr. Kim had provided at the start of the stop, which was that he crossed over the fog line because he had sneezed (*Id.*).

After that exchange, Trooper May told Mr. Kim that Trooper May was calling for a drug-detection dog (*Id.*). While waiting on the drug dog, Trooper May and Mr. Kim discussed further Mr. Kim's criminal history (*Id.*). Mr. Kim explained that he never smoked marijuana before (*Id.*).

Trooper May then confronted him with his prior arrest (*Id.*).  Mr. Kim said that the drugs were not his (*Id.*).  Trooper May and Mr. Kim also discussed further Mr. Kim's travel plans (*Id.*).  During that conversation, Mr. Kim said that he did not have any plane tickets because he was not sure yet if he was going to be out there for two or three days (*Id.*).  Mr. Kim also said that he thought that his wife had already bought the tickets or maybe their friends had purchased them (*Id.*).  Mr. Kim also mentioned that he and his wife have two children, ages 16 and 17, who are in school (*Id.*).

While they were waiting, Trooper May was also still running records checks on Ms. Kim to confirm her story that she did not have any criminal history (*Id.*).  According to the United States, Trooper May was thinking out loud about a false positive because, as he was typing, he can be heard to say "wrong person." (*Id.*, at 5-6).  Trooper May also had not issued the warning ticket at that point (*Id.*, at 6).  Around this time, approximately 18 minutes into the stop, Trooper May was also in contact with the Trooper Mark Blackerby, who had the drug detection dog (*Id.*).  According to the United States, Trooper Blackerby would have arrived by that point, but there was a miscommunication that took him about 15 miles out of the way (*Id.*).  Trooper Blackerby and his canine partner Raptor arrived approximately 31 minutes into the stop (*Id.*).  At the time of the traffic stop, Raptor was properly certified and trained to detect an odor of marijuana, methamphetamine, cocaine, and heroin (*Id.*).

Before Raptor examined the car, Trooper May had Ms. Kim get out of the car and stand at the front (*Id.*).  Trooper Blackerby and Raptor then conducted their examination of the Kims' car (*Id.*).  During that examination, Raptor alerted to an odor of narcotics on the car (*Id.*).  After the dog alerted to the car, the officers conducted a probable cause search and found a backpack that appeared to have been locked (*Id.*).  While the officers were looking at the bag, Ms. Kim attempted

5

to step to the back of the car and speak with Mr. Kim (*Id.*). The officer stopped her and had her return to the front of the car (*Id.*).

The officers went back to the search (*Id.*). The officers were able to feel something that felt like money in the bag (*Id.*). They opened the backpack to confirm that there was money inside. Inside they found a quantity of cash (*Id.*). A further search uncovered more cash in other pieces of luggage and three cellular devices (*Id.*). The money that officers found, the money that became Defendant Currency, was vacuum sealed (*Id.*). There is not a separate accounting of how much money was found in each location (*Id.*). In total the Defendant Currency consisted of 47 $1.00 bills, 954 $5.00 bills, 1,369 $10.00 bills, 13,730 $20.00 bills, 169 $50.00 bills, and 305 $100.00 bills (*Id.*).

After the money was found, Mr. and Ms. Kim were handcuffed and read their *Miranda* rights (*Id.*). Trooper May wanted to read them their rights because the large quantity of cash and the dog alert made it possible that there would be charges (*Id.*, at 6-7). Trooper May also handcuffed them because this encounter was occurring on the roadside and because he had safety concerns (*Id.*, at 7).

When questioned about the money, Mr. Kim first was equivocal whether the money was his or if it belonged to someone else (*Id.*). Mr. Kim eventually admitted that he had just picked up the bag and was supposed to deliver it (*Id.*). Mr. Kim reported that there was about $10,000.00 in cash in the car and that he was paid $500.00 to deliver it (*Id.*).

After the follow up investigation, the Arkansas State Police seized the Defendant Currency (*Id.*). Shortly after, the Drug Enforcement Agency ("DEA") adopted the case and conducted an administrative forfeiture proceeding (*Id.*). In his challenge to the administrative forfeiture proceeding, Mr. Kim submitted a claim, asserting that the money belonged to him (*Id.*).

**II.     Legal Standard**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez,* 526 F.3d 1115, 1119 (8th Cir. 2008) (citing *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)). "Because a traffic stop is a seizure that implicates the Fourth Amendment, it therefore must be judged for its reasonableness in light of the circumstances." *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021). Binding precedent deems traffic stops reasonable when they are supported by either reasonable suspicion or probable cause. *Whren v. United States,* 517 U.S. 806, 810 (1996); *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994) (en banc); *see also United States v. $45,000.00 in U.S. Currency*, 749 F.3d 709, 715 (8th Cir. 2014). The government bears the burden of establishing that probable cause or reasonable suspicion existed at the time of the stop. *United States v. $45,000.00 in U.S. Currency*, 749 F.3d at 716; *see also United States v. Andrews,* 454 F.3d 919, 922 (8th Cir. 2006); *United States v. Wilson*, No. 5:18-cr-50092-2, 2019 WL 3322082, at *3 (W.D. Ark. July 24, 2019). When defendants challenge the existence of probable cause or reasonable suspicion, courts examine the "totality of the circumstances" to determine if probable cause or reasonable suspicion did, in fact, exist. *United States v. Pacheco*, 996 F.3d 508, 513 (8th Cir. 2021).

Further, the objective standard governing an officer's decision to stop a motorist protects officers who have a mistaken belief that a traffic law is being broken. *See United States v. Sanders,* 196 F.3d 910, 913 (8th Cir. 1999) ("Even if the trailer was not technically in violation of the statute, [the officer] could have reasonably believed that the trailer violated the statute. . . ."); *United States v. $45,000.00 in U.S. Currency,* 749 F.3d at 715. "Probable cause [also] exists when a reasonable

7

officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (citing *United States v. Andrews*, 454 F.3d at 921). "Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop," and "[m]istakes of law or fact, if objectively reasonable, may still justify a valid stop." *Id.* (citing *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Id.* (citations omitted).

"A seizure justified only by a police-observed traffic violation, become[s] unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (internal citations omitted). "Under the Fourth Amendment, an officer may not extend a traffic stop longer than 'the time needed to handle the matter for which the stop was made' unless he has reasonable suspicion of criminal activity." *United States v. Pacheco*, 996 F.3d at 511 (citing *Rodriguez v. United States*, 575 U.S. 348, 350, 358 (2015)). "Reasonable suspicion requires an officer to have 'a particularized and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training.'" *Id.* (citing *United States v. Jones*, 606 F.3d 964, 965-66 (8th Cir. 2010)). "Although a mere hunch is insufficient to establish reasonable suspicion, 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.* at 511-12 (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

Furthermore, reasonable suspicion of criminal activity outside of the traffic violation need not exist at the beginning of the police encounter. *See e.g. United States v. Pacheco*, 996 F.3d 508,

512 (8th Cir. 2021) ("[the Eighth Circuit has] previously found reasonable suspicion to extend a traffic stop in part because of the outwardly puzzling decision to rent a car for a one-way trip at substantial expense."). Multiple innocent and lawful acts during the course of the initial stop, when "viewed in the aggregate by a trained law enforcement officer," can provide the necessary level of suspicion to justify a canine sniff. *United States v. Walker,* 324 F.3d 1032, 1037 (8th Cir. 2003); *see United States v. Stewart,* 631 F.3d 453, 457 (8th Cir. 2011) ("[F]actors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent."); *see also United States v. $45,000.00 in U.S. Currency*, 749 F.3d at 720–21.

### III. Discussion

Mr. Kim alleges that Trooper May did not have probable cause to conduct a traffic stop (Dkt. No. 28, at 7). Further, Mr. Kim alleges that, after conducting the illegal traffic strop, Trooper May did not have reasonable suspicion to continue the detention of Mr. and Ms. Kim and the seizure of the Nissan Rogue (*Id.*). Mr. Kim also argues that he was "in custody" for *Miranda* purposes for the majority of the encounter with Trooper May (*Id.*, at 3).

#### A. The Presence Of Probable Cause To Conduct A Traffic Stop

Mr. Kim argues that it is clear in Trooper May's dashcam footage that he did not cross the fog line and therefore did not commit a traffic violation providing probable cause for Trooper May's traffic stop (Dkt. No. 28, at 9). Mr. Kim argues further that, even if he did touch the fog line, touching the fog line is insufficient to give Trooper May probable cause to conduct a traffic stop because that alleged act does not violate Arkansas state law (*Id.*). In Trooper May's incident report, Trooper May alleges Sung Kim drove onto the fog line numerous times in violation of

9

Arkansas Code Annotated § 27-51-302. In relevant part, Arkansas Code Annotated § 27-51-302 states:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules in addition to all others consistent with this subchapter shall apply:
>
> (1) A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety.

Mr. Kim argues that, because the statute states that vehicles shall be driven "as nearly as practical" within a single lane, driving onto or touching the fog line would not be in violation of the statute (Dkt. No. 28, at 9-10).

The United States responds that Trooper May saw Mr. Kim's vehicle swerving over the fog line and that the Court should therefore find that a traffic violation occurred and that the stop was justified under the Fourth Amendment (Dkt. No. 30, at 14-5). *See Holly*, 983 F.3d at 364 ("It is well established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver."). The United States asserts that this claim is supported by the fact that Trooper May told Mr. Kim that this was the reason he was pulled over at the beginning of the stop (Dkt. No. 30, at 14-15). Further, later in the stop, when Mr. Kim stated that he did not know why he was being stopped, Trooper May reminded Mr. Kim of the discussion they had earlier in the stop regarding the reason Mr. Kim was pulled over (*Id.*). The United States argues that, even if the Court finds no actual violation occurred, the Court should nonetheless find that the stop was justified because Trooper May reasonably believed that he witnessed a violation (*Id.*, at 15). *See Holly*, 983 F.3d at 364 ("Probable cause [also] exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred.").

Mr. Kim points to a number of cases outside the Eighth Circuit in support of his argument that, even if he touched the line, it was not a violation of state law (Dkt. No. 28, at 10-1). The Court notes that none of those cases is controlling. Further, the Court need not ultimately determine whether or not Mr. Kim violated state law, as Trooper May reasonably believed the law had been violated and communicated that to Mr. Kim at the time of the stop. That is sufficient for Fourth Amendment purposes. *Whren*, 517 U.S. at 810 (noting that "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Mr. Kim did not challenge or dispute Trooper May's claims at the time. Considering the totality of the circumstances, including Trooper May's communications with Mr. Kim throughout the traffic stop, the Court finds that, at the very least, Trooper May reasonably believed that he had witnessed a traffic violation and, therefore, had probable cause for the initial traffic stop of the Kims.

### B.     Reasonable Suspicion To Extend The Traffic Stop

Mr. Kim argues that, even if Trooper May had probable cause to pull over the Kims, he did not have reasonable suspicion necessary to prolong the seizure after the traffic stop had been accomplished (Dkt. No. 28, at 12). The United States responds that Trooper May learned enough information during the stop to justify his extension of the stop to allow time for the drug dog to come to the scene (Dkt. No. 30, at 18).

An officer may extend the scope of a traffic stop if, while conducting routine traffic violation-related tasks, the officer develops reasonable suspicion based on specific and articulable facts. *See United States v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021); *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017). "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for

11

probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015). "If the responses . . . and [] circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions. An officer may also question a vehicle's passengers to verify[,] . . . and conflicting stories may provide justification to expand the scope of the stop." *United States v. Barragan*, 379 F.3d 524, 528–29 (8th Cir. 2004). "In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (quoting *United States v. Jones*, 269 F.3d 919, 927 (8th Cir.2001) (evaluating a traffic stop as an investigative detention and extending the Court's logic with regard to *Terry* stops)). The Court may also consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity. *Id.*

Here, the United States argues that Trooper May learned enough information during the course of the routine traffic stop to justify his extension of the stop to allow a drug dog to come to the scene (Dkt. No 30, at 18). Specifically, the United States argues that reasonable suspicion existed here because the Kims presented Trooper May with an implausible travel itinerary, their stories were inconsistent with each other, Mr. Kim had a prior drug offense, Mr. Kim appeared to be shaking when he handed documents to Trooper May, and Mr. Kim's demeanor left Trooper May with the impression that Mr. Kim had something he was trying to hide (Dkt. No 30, at 18).

While "[n]ervousness alone does not constitute reasonable grounds for suspicion," it is a factor the Court may consider. *United States v. Miller*, 20 F.3d 926, 930 (8th Cir. 1994); *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) (holding that nervousness, difficulty answering basic questions about an itinerary, and failure to be forthright about criminal history was sufficient

to constitute reasonable suspicion). The Eighth Circuit has also recognized that implausible travel plans and inconsistent stories are also factors that this Court may include in its analysis. *See Pacheco*, 996 F.3d at 512 (8th Cir. 2021); *Cox*, 992 F.3d at 710 (concluding that a trooper had reasonable suspicion after he observed the motorists' nervousness and demeanors and heard their inconsistent stories about the plan for their travel); *Riley*, 684 F.3d at 763-64 (holding that the driver's vague and conflicting answers to simple questions about his trip were legitimate factors the officer could consider when developing reasonable suspicion); *United States v. Lebrun*, 261 F.3d 731, 734 (8th Cir. 2001) (concluding that inconsistent answers regarding details of a trip could support a finding of reasonable suspicion); *United States v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000) (holding that inconsistent answers regarding the purpose and details of the trip supported a finding of reasonable suspicion).

Viewed in the totality of the circumstances, the Court concludes that Trooper May has stated specific, articulable facts sufficient to establish reasonable suspicion, allowing the extension of the Kims' traffic stop until a drug dog could be brought to the scene. *United States v. Englehart*, 811 F.3d 1034, 1039-40 (8th Cir. 2016) (citing *Rodriguez*, 575 U.S. at 350–51). Even under the Kims' timeline, Trooper May initiated the stop; asked Mr. Kim to exit the vehicle and respond to questions in the patrol car; ran a background check of Mr. Kim; spoke to the passenger Ms. Kim; ran a background check on Ms. Kim; and then Mr. Kim declined consent to search the vehicle, at which time Trooper May called for the drug dog (Dkt. No. 28, at 2-3). The totality of the circumstances observed and information gathered by Trooper May during these actions established reasonable suspicion to allow the extension of the stop. *Id.* Therefore, the Court finds both that Trooper May had reasonable suspicion to extend the stop to allow time for a drug dog to arrive on the scene and that the stop was not unreasonably extended beyond the initial traffic stop.

### IV. *Miranda* Custody

Mr. Kim contends that his statements after the six-minute mark should be suppressed because he was not read his *Miranda* rights (Dkt. No. 28, at 18). *Miranda* applies to custodial interrogations. *United States v. Diaz*, 736 F.3d 1143, 1149 (8th Cir. 2013). In analyzing whether a person was in *Miranda* custody at the time of an interview, "[t]he ultimate question is whether a reasonable person would feel free to leave under the totality of the circumstances, that is, 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Holleman*, 743 F.3d 1152, 1159 (8th Cir. 2014) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

In the context of a roadside traffic stop, the Eighth Circuit has recognized that "[a]lthough stopped drivers are detained, they are generally not in custody during the roadside questioning that is permitted during a traffic stop." *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2021). Important factors to consider are the location of the questioning, the number of officers present, whether the motorist was handcuffed during the questioning, and whether the motorist was told that his detention would continue after the traffic stop. *Id.* at 377.

Considering the circumstances of Mr. Kim's traffic stop, the Court finds that he was not in *Miranda* custody before the Defendant Currency was found. First, similar to *Soderman*, although the questioning occurred in a patrol car, prior to the discovery of the Defendant Currency, Mr. Kim was not put in the locked backseat, nor was he placed into handcuffs. "He thus retained a degree of free movement, as reflected by his frequent gestures, body movement, and statements, and was not constrained to the degree associated with a formal arrest." *Soderman*, 983 F.3d at 377.

The number of officers suggests that Mr. Kim was not in custody. In Mr. Kim's case, there was only one officer present during the questioning until the canine officer arrived. At that point,

there were only two officers on scene. The presence of only one or two officers is a factor that cuts against a finding that the motorist was custody. *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 438-39 (1984)).

Prior to finding the Defendant Currency, there was no indication that Mr. Kim's detention would continue after the traffic stop was completed. When Trooper May decided that a drug dog needed to come to the scene, he told Mr. Kim that a positive alert would provide probable cause for a search, but again, he did not assert that Mr. Kim would be placed under arrest. Under these facts, this factor also indicates that Mr. Kim was not in custody prior to the discovery of the Defendant Currency. *Id.*

Further, after the Defendant Currency was located, Trooper May read to the Kims their *Miranda* rights. Mr. Kim did not attempt to invoke his right to counsel or right to remain silent; instead he voluntarily made statements and answered questions. The Court concludes that there was no *Miranda* violation.

### V. Conclusion

For the foregoing reasons, the Court denies Mr. Kim's motion to suppress (Dkt. No. 28).

It is so ordered this 21st day of March, 2022.

Kristine G. Baker
United States District Judge